SEALED

1 | Gail A. Glick (California Bar No. 174293)
Alexander, Krakow & Glick LLP
2 | 1900 Avenue of the Stars, Suite 900
Los Angeles, California 90067
3 | (310) 394-0888
4 | (310) 394-0811 (facsimile)
gglick@akgllp.com
5 | *Counsel for Plaintiff-Relator*

6 | R. Scott Oswald (to be admitted *pro hac vice*)
soswald@employmentlawgroup.com
7 | Janel Quinn (to be admitted *pro hac vice*)
8 | jquinn@employmentlawgroup.com
The Employment Law Group, P.C.
9 | 888 17th Street, NW, Suite 900
Washington, D.C. 20006
10 | (202) 261-2806
11 | (202) 261-2835 (facsimile)
*Counsel for Plaintiff-Relator*

**FILED**

FEB 1 0 2020

CLERK, U.S. DISTRICT COURT
EASTERN DISTRICT OF CALIFORNIA
BY _____
DEPUTY CLERK

12 |
13 | **IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF CALIFORNIA**
14 | **Sacramento Division**

2:2 0 - CV - 2 9 6   TLN EFB

15 | UNITED STATES OF AMERICA AND THE
STATE OF CALIFORNIA, *ex rel.*

Case No. _____

16 |
17 | [UNDER SEAL]

**FILED UNDER SEAL**

18 | *Plaintiff,*

**COMPLAINT FOR VIOLATIONS OF**
**THE FALSE CLAIMS ACT, 31 U.S.C.**
19 | v.

**§§ 3729,** *et seq.***; AND THE CALIFORNIA**
**FALSE CLAIMS ACT, CAL. GOV'T**
20 | [UNDER SEAL]

**CODE §§ 12650,** *et seq.*

21 |
22 | *Defendants.*

**JURY TRIAL DEMANDED**

23 |
24 |
25 |
26 |
27 |
28 |

COMPLAINT
CASE NO. _____

1 | Gail A. Glick (California Bar No. 174293)
Alexander, Krakow & Glick LLP
2 | 1900 Avenue of the Stars, Suite 900
Los Angeles, California 90067
3 | (310) 394-0888
4 | (310) 394-0811 (facsimile)
gglick@akgllp.com
5 | *Counsel for Plaintiff-Relator*

6 | R. Scott Oswald (to be admitted *pro hac vice*)
soswald@employmentlawgroup.com
7 | Janel Quinn (to be admitted *pro hac vice*)
8 | jquinn@employmentlawgroup.com
The Employment Law Group, P.C.
9 | 888 17th Street, NW, Suite 900
Washington, D.C. 20006
10 | (202) 261-2806
11 | (202) 261-2835 (facsimile)
*Counsel for Plaintiff-Relator*

12 |
**IN THE UNITED STATES DISTRICT COURT**
13 | **FOR THE EASTERN DISTRICT OF CALIFORNIA**
**Sacramento Division**
14 |

15 | UNITED STATES OF AMERICA AND THE | **Case No.** _____
STATE OF CALIFORNIA, *ex rel.*

16 |
MICHAEL BICOCCA | **FILED UNDER SEAL**
17 | 2530 Highland Hills Drive
El Dorado Hills, CA 95762 | **COMPLAINT FOR VIOLATIONS OF**
18 | **THE FALSE CLAIMS ACT, 31 U.S.C.**
**§§ 3729, *et seq.;* AND THE CALIFORNIA**
19 | *Plaintiff,* | **FALSE CLAIMS ACT, CAL. GOV'T**
20 | v. | **CODE §§ 12650, *et seq.***

21 | PERMANENTE MEDICAL GROUP, INC.
1950 Franklin Street, 18th Floor, | **JURY TRIAL DEMANDED**
22 | Oakland, CA 94612
SOUTHERN CALIFORNIA PERMANENTE
23 | MEDICAL GROUP, INC.
24 | 393 Walnut Drive, Pasadena, CA
91107
25 | THE PERMANENTE FEDERATION, LLC.
1 Kaiser Plaza, 27th Floor, Oakland,
26 | CA 94612

27 | *Defendants.*

28 |

- 2 -

1
2

**COMPLAINT**

3

**I.  Introduction**

4      1.     *Qui tam* relator Michael Bicocca ("Relator") by his attorneys, individually and on

5   behalf of the United States of America and the State of California, files this Complaint against

6   the above-named Defendants to recover damages, penalties, and attorneys' fees for violations of

7   the federal False Claims Act ("FCA"), 31 U.S.C. §§ 3729 *et seq.*, and the California False

8   Claims Act ("CFCA"), Cal. Gov't Code § 12651 *et seq.*

9
10      2.     Defendants intentionally instruct physicians to certify that they have managed

11   their patients' chronic conditions, even though they have not managed the chronic condition, and

12   in many instances are not equipped to manage a patient's chronic conditions. Defendants then

13   bill these false certifications in claims to Medicare and the California Public Employees'

14   Retirement System ("CalPERS") to receive undeserved capitation payments from the United

15   States and the State of California.

16      3.     Because the data Defendants submit to Medicare and CalPERS for continued
17
    capitation rates intentionally and falsely states that the patients' chronic conditions were
18
19   effectively managed, Defendants receive additional, undeserved capitation amounts.

20      4.     CMS regulations state that Chronic Condition Management (CCM), i.e. the

21   treatment of reoccurring, constant, and damaging conditions overtime, must be specialized and

22   detail-oriented in order to be reimbursable.

23      5.     Rather than promoting these regulations to its physicians, Defendants tell their
24
    physicians to insert a certification in their doctors' notes meant to show compliance with CMS
25
26   regulations stating that the patient's chronic conditions were listed, considered in medical-

27   decision-making, and referred to a specialist, if applicable. This certification, on a broad level,

28   indicates compliance with CMS regulations related to CCM.

- 3 -

6.      However, Defendants do not require, and effectively discourage physicians from complying with CMS regulations *or its own certification*. Instead, various trainings attended by Defendants' physicians, including Relator Bicocca, repeatedly instructed physicians that all that needed to be done to justify adding this certification to the patient's appointment record was to verify that the patient had chronic conditions, and to make sure that these chronic conditions are "stable."

7.      Even though CCM regulations promoted by CMS are meant to promote specialized and detail-oriented management of patients' chronic conditions, neither the certification nor the trainings promoted by Defendants reflect this.

8.      Worse, Defendants *require* all physicians to satisfy this requirement during every appointment. It is effectively impossible for most physicians to comply with the requirements for CCM because they have neither the time nor the expertise to manage every chronic condition for every patient they see. For example, Bicocca's specialty is pain management, meaning he does not have the qualifications to manage a patient's depression.

9.      Use of this certification results in coding to the CCM CPT codes, either normal or complex, despite the requirements for those codes not being met. Despite Defendants' receiving capitated payments from CMS under Medicare Part C with the cost of CCM built-in, Defendants do not engage in Chronic Condition Management such that they should be receiving capitated rates from CMS at the level they are.[1]

10.      The result of this is profit at the expense of the United States of America and the State of California.

---

[1] While most patients seen by Permanente with public benefits are Medicare Part C beneficiaries, some patients in this scheme may be under other programs or plans, resulting in Defendants receiving FFS payments from CMS for fraudulent use of the CCM CPT code.

- 4 -

COMPLAINT
CASE NO. _____

**II. Jurisdiction and Venue**

11.     This Court has subject matter jurisdiction over this action under the FCA because it is an action arising under the laws of the United States, specifically 31 U.S.C. § 3730(b).

12.     This Court has personal jurisdiction over Defendants pursuant to 31 U.S.C. § 3732(a) because Defendants transact business in this judicial district.

13.     Venue is proper in this Court under 28 U.S.C. § 1391(c) and 1395(a) because illegal acts occurred within this judicial district, Defendants are resident of this district, and because Defendants transact business within this judicial district.

14.     This Court has personal jurisdiction over Defendants because the Defendants are in the State of California.

**III. Parties**

15.     Relator Bicocca is an anesthesiologist with more than 20 years of experience. Bicocca holds a Bachelor of Science degree from California Polytechnic State University in San Luis Obispo and earned his MD from Northeastern Ohio Universities Colleges of Medicine and Pharmacy.[2] Bicocca completed his residency at the University of California, Davis, and did a fellowship at Massachusetts General Hospital in Boston.

16.     Bicocca served as Chief of Pain Management for Kaiser Hospitals in Modesto, Stockton, and South Sacramento, California, before he voluntarily stepped down to return to medical practice full-time. Bicocca subsequently worked as a pain management physician at Kaiser's South Sacramento facility until he retired in December 2019.

17.     Bicocca's practice focuses primarily in pain management. Pain management includes, but is not limited to, management of chronic pain, including facet joint injections.

---

[2] Northeastern Ohio Universities Colleges of Medicine and Pharmacy is now known as Northeast Ohio Medical University (NEOMED).

COMPLAINT

CASE NO. _____

18.     The Permanente Federation, LLC, (Permanente Federation) is a network of corporations that employs thousands of physicians. These corporations are not legally affiliated with each other. However, the Permanente groups' upper level management frequently comingle between firms. For example, Rich Isaacs, CEO and Executive Director of Permanente Medical Group, is also the President and CEO of Mid-Atlantic Permanente, while also working as Co-Chief Executive Officer of the Permanente Federation.

19.     Through the Permanente Federation, the heads of the other Permanente branches coordinate on larger business decisions and plans, while sharing best practices.

20.     Permanente Federation contracts with Kaiser to provide physicians to Kaiser hospitals and the Kaiser insurance group. Permanente Federation provides services exclusively to Kaiser.

21.     One of the corporations within the Permanente Federation network is Permanente Medical Group ("Permanente"), which has twenty one (21) locations in California, including: Antioch, Fremont, Fresno, Modesto, Oakland, Redwood City, Richmond, Roseville, Sacramento, San Francisco, San Jose, San Leandro, San Rafael, Santa Clara, Santa Rosa, South Sacramento, South San Francisco, Stockton, Vacaville, Vallejo, and Walnut Creek.

22.     Permanente serves as both the Northern California regional group and as the flagship group of the Permanente Federation. Permanente is based in Northern California and is the largest Permanente Medical physicians' group, with more than 25,000 employees.

23.     About one third of Permanente's patients are Medicare recipients. Around 90% of those patients have Medicare Part C plans.

24.     Southern California Permanente Medical Group, Inc. is the Permanente group within the Permanente Federation responsible for administering medical care to Southern California residents.

- 6 -

1

**IV. Medicare Overview**

2      25.     In 1965, Congress enacted Title XVIII of the Social Security Act under 42 U.S.C.

3   § 1395, *et seq.* ("The Medicare Program" or "Medicare") authorizing the federal government to

4   pay for the cost of certain medical services for persons aged 65 and older.

5

6      26.     The United States, through the Department of Health and Human Services

7   ("HHS"), administers the Medicare program.

8      27.     Medicare reimbursement to providers of medical services is accomplished

9   through private insurance carriers ("carriers"), as provided by 42 U.S.C. § 1395u. The carrier, on

10   behalf of the Medicare Program, reviews and approves claims submitted for reimbursements by

11   Medicare.

12      28.     At all relevant times hereto, Defendant signed or caused to be executed provider

13   agreements with Medicare that permitted Defendant to submit claims and accept payment for

14   services provided by Defendant.

15

16      29.     As a condition of participation in the Medicare program, providers agree to be

17   familiar with, and abide by, the program's reimbursement policies. When the Defendant

18   physicians submitted their Medicare Enrollment Applications, they certified to the following

19   requirements:

20             I agree to abide by the Medicare laws, regulations and program
21             instructions that apply to this supplier. The Medicare laws,
               regulations, and program instructions are available through the
22             Medicare contractor. I understand that payment of a claim by
               Medicare is conditioned upon the claim and the underlying
23             transaction complying with such laws, regulations, and program
               instructions (including, but not limited to, the Federal anti-
24             kickback statute and the Stark law), and on the supplier's
               compliance with all applicable conditions of participation in
25             Medicare.
26
               I agree that any existing or future overpayment made to the
27             supplier by the Medicare program may be recouped by Medicare
28             through the withholding of future payments.

COMPLAINT

CASE NO. _____

> I will not knowingly present or cause to be presented a false or fraudulent claim for payment by Medicare, and will not submit claims with deliberate ignorance or reckless disregard of their truth or falsity.

> *See* CMS Form 855-B, Medicare Enrollment Application.

30.     Accordingly, Defendant has a duty to be knowledgeable of the statutes, regulations, and guidelines regarding coverage for Medicare services.

31.     Medicare generally does not cover, and providers agree not to submit claims for, services provided that are not necessary, not appropriately administered, or not properly documented.

32.     In short, for Defendant to be properly reimbursed by the Medicare program, CMS requires that the treating physician order the applicable medically necessary services, and appropriately document the justification and administration of those services.

33.     Before accepting Medicare assignments, Defendant, and all providers who submit claims for services provided to Medicare beneficiaries, must certify that they will operate in accordance with HHS requirements.

34.     In addition, requests for Medicare reimbursement are submitted on Health Insurance Claim Form CMS-1500. The CMS-1500 form includes a box for the "SIGNATURE OF PHYSICIAN OR SUPPLIER INCLUDING DEGREES OR CREDENTIALS (I certify that the statements on the reverse apply to this bill and are made a part thereof.)"

35.     Among the statements on the reverse of the CMS-1500 form is the following:

> **SIGNATURE OF PHYSCIAN OR SUPLLIER (MEDICARE,**
> **TRICARE, FECA AND BLACK LUNG)**

> In submitting this claim for payment from federal funds, I certify that: 1) the information on this form is true, accurate, and complete; 2) I have familiarized myself with all applicable laws, regulations, and program instructions, which are available from the Medicare contractor; 3) I have provided or will provide

- 8 -

1
2
3
4

> sufficient information required to allow the government to make an informed eligibility and payment decision; 4) this claim, whether submitted by me or on my behalf by my designated billing company, complied with all applicable Medicare and/or Medicaid laws, regulations, and program instructions for payment …

5
6
7

> NOTICE: Anyone who misrepresents or falsifies essential information to receive payment from Federal funds requested by this form may upon conviction be subject to fine and imprisonment under applicable Federal laws.

8      36.    When filing the electronic equivalent of the CMS-1500, a provider also certifies

9  that:

10
11
12
13

> The services shown on this form were medically indicated and necessary for the health of the patient and were personally furnished by me or were furnished incident to my professional service by my employee under my immediate personal supervision, except as otherwise expressly permitted by Medicare or CHAMPUS regulations.

14      37.    When submitting a claim using the CMS-1500 form, the provider/supplier also

15 certifies that (i) the information on the form is "true, accurate and complete"; (ii) payment of the

16
17 claim will be from federal funds; and (iii) "any false claims, statements, or documents, or

18 concealment of a material fact, may be prosecuted under applicable Federal . . . laws."

19      38.    Completed CMS-1500 forms are submitted electronically to a Medicare

20 contractor that then reviews the claims for blatant errors, such as missing fields and/or

21 information, and HIPPA violations. If a claim is accepted, the requesting company receives

22 electronic notification.

23      39.    Although the Medicare contractor is checking for errors, the certifying physician

24
25 or supplier is ultimately responsible for the accuracy of the information upon which the claim is

26 based.

27
28

- 9 -

**V. Medicare Advantage Organizations under Medicare**

40.     Medicare Part C, or Medicare Advantage, is a program in which CMS works more closely with private companies, called Medicare Advantage Organizations (MAOs), to offer semi-private, semi-public plans that cover Medicare Part A and B services. Part C plans will sometimes also cover prescription drug benefits under Medicare Part D. *See U.S., ex rel. Osheroff v. HealthSpring, Inc.*, 938 F. Supp. 2d 724, 726 (M.D. Tenn. 2013).

41.     "The Centers for Medicare & Medicaid Services ("CMS") compensates MAOs at a capitated rate for the delivery of benefits. To participate in the Medicare Advantage program, MAOs must submit bids to CMS every year in which they offer to provide services for a specified amount per member, per month. Each participating MAO must then enter into a contract with CMS, the terms of which require the MAO to comply with certain laws, including. . . . the [False Claims Act]. To receive payment for services provided under the Medicare Advantage program, MAOs must submit monthly payment requests to CMS along with monthly reports certifying that all information submitted to CMS in this report is accurate, complete, and truthful." *United States ex rel. Derrick v. Roche Diagnostics Corp.*, 318 F. Supp. 3d 1106, 1110 (N.D. Ill. 2018) (internal citations and quotations omitted).

42.     "By law, CMS must pay Medicare Advantage insurers in a manner that ensures 'actuarial equivalence' between payments for healthcare under Medicare and Medicare Advantage plans[.]" *UnitedHealthcare Ins. Co. v. Azar,* 330 F. Supp. 3d 173, 178 (D. D.C. 2018), *appeal filed* 11/14/18, U.S. Court of Appeals for the D.C. Circuit, Case No. 18-5326 (citing 42 U.S.C. § 1395w-23(a)(1)(C)(i) ).

43.     "Traditional Medicare uses a fee-for-service payment model, whereby the more services physicians perform, the more money they earn . . . . Capitation means an amount is paid per person. Under Medicare Advantage's capitation system, private health insurance

organizations provide Medicare benefits in exchange for a fixed monthly fee per person enrolled in the program—regardless of actual healthcare usage. These organizations pocket for themselves or pay out to their enrollees' providers the difference between their capitation revenue and their enrollees' medical expenses, creating an incentive for the organizations to rein in costs." *United States ex rel. Anita Silingo v. WellPoint, Inc.*, 904 F.3d 667, 672 (9th Cir. 2018) (internal citations and quotations omitted).

44.     Simply put, Medicare Advantage is supposed to compensate these organizations for expected healthcare costs, paying "less for healthier enrollees and more for less healthy enrollees." *United States v. United Healthcare Ins. Co.*, 848 F.3d 1161, 1166 (9th Cir. 2016) (*citing* 42 C.F.R. § 422.504(*l*), (*l*)(2))).

45.     Defendants are members of the Medicare Advantage Program and are therefore MAOs.

46.     Bicocca's patients covered by public insurance programs are mainly participants in the Kaiser Permanente Senior Advantage Enhanced Plan (HMO), which is a Medicare Part C plan that provides Medicare Part D benefits as well.

47.     Permanente therefore receives a regular capitation rate from CMS for each Part C patient it sees. This rate is meant to cover the cost of caring for the patient.

**VI. California Public Employees' Retirement System**

48.     CalPERS is a retirement system created by statute, for the purpose of administering retirement, disability and death benefits for California state employees. Cal. Gov't Code § 20001 *et seq.*

49.     "CalPERS is a unit of the Government Operations Agency responsible for administering the retirement systems for the State of California and contracting agencies—local public agencies that have elected to have all or part of their employees become members of this

- 11 -

1  system and that have contracted with CalPERS for that purpose." *Marzec v. California Pub.*

2  *Employees Ret. Sys.*, 236 Cal. App. 4th 889, 896 (2015) (internal quotations omitted).

3      50.     "CalPERS is a unit of the Government Operations Agency. In addition to

4  administering the retirement system for employees of California and other public entities,

5
   CalPERS operates health insurance plans, including the PERS Choice health plan. . . . ."
6

7  *Orthopedic Specialists of S. California v. Pub. Employees' Ret. Sys.*, 228 Cal. App. 4th 644, 646

8  (2014) (quotations omitted).

9      51.     CalPERS is the United States' largest public pension fund and provides benefits

10  to approximately 1.9 million members. CalPERS members include public employees, retirees,

11  and their families. CalPERS provides benefits to its members including health insurance, long-

12  term insurance, death benefits, mortgage programs, and the distribution of pension and

13  retirement-related financial benefits.
14

15      52.     When members, their spouses, or their dependents become Medicare eligible due

16  to age or disability, the members are encouraged to notify CalPERS so that they can be enrolled

17  in the CalPERS Medicare health plan.

18      53.     As a retiree, when a member first becomes eligible for Medicare, they must

19  request a change from a CalPERS Basic Health Plan to a CalPERS Medicare Health Plan. When

20  a CalPERS member retires and enrolls in Medicare Part A and Part B, CalPERS will work with

21
   the CMS to obtain the retiree's Medicare information and automatically transfer the retiree from
22

23  a CalPERS Basic (non-Medicare) health plan to a CalPERS Medicare health plan.

24      54.     The CalPERS Medicare Health Plan requires Medicare to assume the role as the

25  primary payer for health care costs, thus CalPERS members who receive health services result in

26  expenditures to Medicare.

27

28
                                        - 12 -

## VII.    **Chronic Condition Management (CCM)**

55.    In 2015, Medicare changed its rules to focus on preventative care, especially regarding patients who suffer from chronic health conditions.

56.    The latest change or rules related to chronic care management can be found in the Federal Register, from a proposed, and accepted rules change in November 2016. *Reducing Administrative Burden and Improving Payment Accuracy for Chronic Care Management (CCM) Services* 81 FR 80243.

57.    The proposed rule changes provide further information regarding the rationale for these changes. "Beginning in CY 2015, we implemented separate payment for CCM services under CPT code 99490 (Chronic care management services, at least 20 minutes of clinical staff time directed by a physician or other qualified health professional, per calendar month) . . . ." 81 FR 80243.

58.    The purpose of this change was "to improve payment for, and encourage long-term investment in, care management services." 81 FR 80243 (*citing* 79 FR 67715).

59.    The changes in the rules reflected the regulators' desire to make sure physicians and facilities had "the resources required to furnish complex chronic care management services to beneficiaries with multiple (that is, two or more) chronic conditions were not adequately reflected in the existing E/M codes." 81 FR 80243.

60.    One concern of the regulators was compensating and incentivizing physicians to spend an adequate amount of time on patients with chronic conditions. "Medical practice and patient complexity required physicians, other practitioners and their clinical staff to spend increasing amounts of time and effort managing the care of comorbid beneficiaries outside of face-to-face E/M visits, for example, complex and multidisciplinary care modalities that involve regular physician development and/or revision of care plans; subsequent report of patient status;

review of laboratory and other studies; communication with other health care professionals not employed in the same practice who are involved in the patient's care; integration of new information into the care plan; and/or adjustments of medical therapy." 81 FR 80243.

61.     In addition to making sure physicians had the time, resources, and compensation to fully manage their patients' chronic conditions, the regulators were also concerned with making sure physicians were sufficiently *capable of furnishing such services*.

62.     "In finalizing separate payment for CPT code 99490, we considered whether we should develop standards to ensure that physicians and other practitioners billing the service would have the capability to fully furnish the service." 81 FR 80243 (*citing* 79 FR 67721).

63.     "We established requirements to furnish a preceding qualifying visit, obtain advance written beneficiary consent, use certified electronic health record (EHR) technology to furnish certain elements of the service, share the care plan and clinical summaries electronically, document specified activities, and other items. . . ." 81 FR 80243.

64.     A common complaint listed among stakeholders was that the chronic care management CPT code was usually exceeded without additional benefit, disincentivizing care longer of 20 minutes, which led to the revision/creation of CPT code 99487, meant specifically for "complex" cases, where there would be higher reimbursement for 60 minutes of time spent with patients. *See* 81 FR 80244.

65.     The below CPT codes, therefore, are meant to incentivize spending more time on patients with chronic conditions and so that the physician can conduct an in-depth review of the patient's chronic condition as opposed to simply a quick check-up.

66.     CMS therefore reimburses health providers a certain amount per patient for a condition in a month/year basis – not on a per visit basis for treatment of chronic conditions.

COMPLAINT
CASE NO. _____

67. There are two categories chronic conditions that Medicare focuses on: complex and non-complex.

68. The criteria for billing for monitoring and management of "non-complex" chronic conditions (CPT Code 99490) are:

    a. a doctor/physician assistant/nurse practitioner must spend at least 20 minutes with the patient per month,

    b. the patient must have multiple chronic conditions expected to last at least 12 months,

    c. the chronic condition must place the patient at significant risk of death, decompensation, or functional decline, and

    d. a comprehensive care plan must be established, implemented and monitored by the care giver.

69. If the criteria for non-complex patients' chronic care management plans are met, Permanente would receive a reimbursement of approximately $43.00 per patient per month on a fee-for-service plan (FFS).

70. The criteria for billing for monitoring "complex" chronic conditions (CPT Code 99487) are the following:

    a. patients must have multiple chronic conditions expected to last at least 12 months (or until death),

    b. the chronic conditions place the patient at significant risk of death or functional decline,

    c. the medical providers establish a comprehensive care plan,

    d. there must be moderate or high complexity in medical decision making, and

COMPLAINT
CASE NO. _____

      e.   a doctor/physician assistant/nurse practitioner must spend at least 60 minutes with the patient per month.

71.    Physicians should be providing an in-depth analysis of patient conditions to determine if the conditions are being controlled; a physician can't simply ask if the patient is on medication or if they have experienced mood swings but needs to provide a more thorough service to bill for the complex chronic care management.

72.    If the criteria for complex patients' chronic care management plans are met, Permanente would receive a reimbursement of approximately $94.00 per patient per month on a Fee-for-service (FFS) plan.

73.    Several conditions qualify as chronic conditions. These include:

    a.   Alzheimer's Disease and Related Dementia

    b.   Arthritis (Osteoarthritis and Rheumatoid)

    c.   Asthma

    d.   Atrial Fibrillation

    e.   Autism Spectrum Disorders

    f.   Cancer (Breast, Colorectal, Lung, and Prostate)

    g.   Chronic Kidney Disease

    h.   Chronic Obstructive Pulmonary Disease

    i.   Depression

    j.   Diabetes

    k.   Heart Failure

    l.   Hepatitis (Chronic Viral B & C)

    m.   HIV/AIDS

    n.   Hyperlipidemia (High cholesterol)

- 16 -

1          o.   Hypertension (High blood pressure)

2          p.   Ischemic Heart Disease

3          q.   Osteoporosis

4          r.   Schizophrenia and Other Psychotic Disorders

5          s.   Stroke

6

7        74.   While most of Bicocca's patients are not served under an FFS plan, the

8    regulations governing chronic condition management and the costs of such care are factored into

9    the capitation rates given to Defendants by CMS.

10       75.   Permanente's scheme affects Medicare more than CalPERS. At least 10% of the

11   entire Permanente patient population is on the CalPERS program.

12       76.   In sum, CCM is meant to be an in-depth review and plan for managing difficult,

13   often complex, conditions that usually require the skills of a specialist, or that of an experienced

14   general physician.

15

16       77.   Relator Bicocca, before Permanente's scheme began, would rarely engage in

17   CCM as a part of his Paint Management specialty.

18       78.   Relator's knowledge of medical practice in general suggests that most specialists

19   also spend little time on CCM unless that chronic condition is directly applicable to that

20   specialist's practice.

21

22       79.   Relator's knowledge of medical practice in general suggests that, aside from

23   specialists engaging in CCM related to their practices, most CCM comes into play with

24   experienced generalists who have elderly patients with multiple chronic conditions.

25

26

27

28

- 17 -

## VIII.   The False Claims Act and California False Claims Act

80.     The FCA, 31 U.S.C. §§ 3729–3733 was enacted in 1863 by Congress and provides that any person who knowingly submitted false claims to the government was liable for damages plus a penalty for each claim. The FCA has been amended several times.

81.     The FCA imposes liability on any person or entity who knowingly presents or causes to be presented a false or fraudulent claim for payment or approval. 31 U.S.C. § 3729(a)(1)(A). Additionally, those who make, use or cause to be made a false statement or record material to the claim are also liable under the FCA. 31 U.S.C. § 3729(a)(1)(B).

82.     The terms "knowing" and "knowingly" are defined by the statute as a person having actual knowledge of the information, acting in deliberate ignorance of the truth or falsity of the information, or acting in reckless disregard of the truth or falsity of the information. 31 U.S.C. § 3729(a)(3)(B)(4).

83.     The term "material" means having a natural tendency to influence, or be capable of influencing, the payment or receipt of money or property. 31 U.S.C. § 3729(a)(3)(B)(4).

84.     "A claim under the False Claims Act requires a showing of (1) a false statement or fraudulent course of conduct, (2) made with the scienter, (3) that was material, causing (4) the government to pay out money or forfeit moneys due." *United States ex rel. Campie v. Gilead Scis., Inc.*, 862 F.3d 890, 899 (9th Cir. 2017), *cert. denied sub nom. Gilead Scis., Inc. v. U.S. ex rel. Campie*, 139 S. Ct. 783, 202 L. Ed. 2d 566 (2019).

85.     Any person who violates the FCA is liable for damages in the amount of three (3) times the amount of loss the government sustained and penalties which range between $10,957 and $21,916 per claim. 31 U.S.C. § 3729(a); 28 C.F.R. § 85.3.

- 18 -

COMPLAINT
CASE NO. _____

86.     The California False Claims Act also imposes liability on any person or entity who knowingly presents or causes to be presented a false or fraudulent claim for payment or approval to the State of California. Cal. Gov't Code § 12651 *et seq.*

87.     "[Fraud against] [t]he Medicare Advantage capitation payment system is subject to the False Claims Act." *United States ex rel. Anita Silingo v. WellPoint, Inc.*, 904 F.3d 667, 673 (2018).

**IX. Factual Overview**

88.     Permanente instructs physicians to certify that they meet the conditions of CPT codes 99487 or 99490 for every Medicare or other public benefits appointment they have but instructed the physician to do so in a manner that could never satisfy CMS requirements. These certifications by physicians were then coded under the above CPT codes and billed to Medicare and CalPERS for the purpose of receiving a higher capitation rate from the United States, and in order to make a larger profit off the capitation rate Permanente receives.

89.     Rather than fulfilling the requirements of the CPT codes as set out by CMS, physicians at Permanente were instructed to simply discuss the chronic conditions, insert the foregoing certification, and consider the conditions assessed as is required by CMS.

90.     Relator raised concerns that for most providers it would be effectively impossible to sufficiently meet CCM requirements to management and Permanente staff who conducted training on CCM, but never received a meaningful response, one that adequately provided Relator the tools to truthfully make the certification Defendants required. Defendants have not changed their policies and trainings.

- 19 -

a. **Permanente bills for chronic care management even though many of its physicians do not engage in chronic care management.**

91.     In or around 2015, Permanente changed how it directed its physicians to manage chronic conditions through a series of trainings on billing, note writing, and coding.

92.     The trainings and policy changes directed by Permanente management were meant specifically to affect only Medicare and other public benefits patients, creating a two-tiered system of CCM, where private health insurance patients are given the usual CCM treatment, if any, and where physicians are required to give public benefits patients CCM coverage.

93.     The trainings contained inaccurate information. In fact, before reviewing the foregoing rules himself, Bicocca was falsely trained to believe that CCM CPT codes were satisfied with one visit per year with the patient with a lump sum payment representing one year of coverage

94.     Permanente directs its physicians to check off all chronic conditions that could conceivably apply to a patient and place a certifying statement in the patient's record, without adequate *management* of those chronic conditions as required by federal regulations and CMS. Again, this mandate was only required for patients with public benefits, not all patients seen by Permanente physicians.

95.     For example, Defendants' trainings never mentioned the requirement that CCM required the creation of a comprehensive care plan for the chronic conditions.

96.     Over time, Defendants' method of directing physicians to perform this fraud grew more subtle as Bicocca continually objected to the trainings.

97.     Senior leadership at Permanente, including Jason Guardino, the Assistant Physician in Charge (APIC) and Chief of Gastroenterology Department, provide the language for the certifying statements.

- 20 -

98.     Senior leadership at Permanente, through emails and training initiatives, directed physicians to write the following in their charts:

> I have confirmed the presence of the above clinical diagnoses, which were considered in the current and ongoing care of the patient. At the time of the visit, the medical record indicates, and/or the patient states, that there are no changes in these conditions unless otherwise noted. As treatment warrants, the patient has been advised to follow up with her PCP or appropriate specialist.

99.     This statement suggests that some, but not all of the steps of management of a patient's chronic conditions are satisfied: (1) the physician confirms that the patient has qualifying chronic conditions, and (2) the physician considers these chronic conditions when making medical decisions about that patient.

100.    The statement also notes that, if there are no additional notes, then there were no changes in the patient's chronic conditions, while also noting that the patient was advised to speak to their specialist physicians regarding those specialist conditions if necessary.

101.    This is problematic, however, as the regulations show that management of a patient's condition typically means *acting as that specialist*, not simply referring the issue away.

102.    For example, below is an email from Permanente confirming the language of the certification, dated August 11, 2015. The email includes a statement by Serene Tran, a trainer, citing an improper interpretation of what is needed to satisfy the CCM requirements.

| Serene N Tran | "I have confirmed the presence of the above clini... | 08/11/2015 01:24:31 PM |
|---|---|---|

| From: | Serene N Tran/CA/KAIPERM |
|---|---|
| To: | Jeremy Lawrence/CA/KAIPERM@KAIPERM |
| Cc: | Jason M Guardino/CA/KAIPERM@Kaiperm, Keshia Y Redmond/CA/KAIPERM@Kaiperm, Michael J Bicocca/CA/KAIPERM@Kaiperm |
| Date: | 08/11/2015 01:24 PM |
| Subject: | Re: .refresh - clarification needed |

"I have confirmed the presence of the above clinical diagnoses, which were considered in the current and ongoing care of the patient. At the time of this visit, the medical record indicates, and/or the patient states, that there are no changes in these

- 21 -

conditions unless otherwise noted. As treatment warrants, the patient has been advised to follow up with her PCP or appropriate specialist. "

Above is the revised version of the .FOL which is included in our .REFRESH smartphrase.

What I take from this is that as long as you review the chart (problem list, medication list, and/or labs) when you see the patient, you can confirm that the patient has the diagnosis and the decision you make will be influenced (explicitly or implicitly) by the patient's medical history.
Also, the revised version included the phrase "as treatment warrants" to imply that if there is no change of treatment needed, you do not need to advise the patient to follow up with pcp or specialist.

I hope this helps.

Serene

**NOTICE TO RECIPIENT:** If you are not the intended recipient of this e-mail, you are prohibited from sharing, copying, or otherwise using or disclosing its contents. If you have received this e-mail in error, please notify the sender immediately by reply e-mail and permanently delete this e-mail and any attachments without reading, forwarding or saving them. Thank you.

103.    Permanente requires physicians, in order to use the certification, to go through the entire list of chronic conditions, regardless of whether physicians have the time or qualifications to do so. It is difficult for physicians to accomplish without lying.

104.    For example, if a patient comes to see Dr. Bicocca for a facet injection, but also has diabetes, high blood pressure, a history of cancer, depression, or high cholesterol, then the foregoing policy would obligate Dr. Bicocca and other physicians to check all of the above conditions, certify that the patient's conditions are stable, and recommend the patient follow-up as necessary with their primary care physician or specialist. Dr. Bicocca, a pain management physician, is not trained and does not have the expertise or ability to manage the patient's cancer or depression for example. Nor are some of the above conditions relevant to Dr. Bicocca's medical decision making regarding the patient's pain management issues.

105.    Despite billing for managing chronic conditions as defined by the above CPT codes, Permanente physicians do not meet the time requirements set forth by CMS to bill for managing those conditions. In addition, Permanente physicians may not have the expertise to address the chronic conditions Permanente is pressuring them to address.

106.   Bicocca and other physicians do not typically have appointments which last long enough to discuss each of these conditions in full detail and to, in good faith, write the Permanente-supplied certification in the chart.

107.   Below is a quick overview of Relator Bicocca's typical appointments, which begin at 7:30 AM every weekday.

   a.   As of Fall 2018, forty-five-minute consultations for new patients, with limited discussion of non-pain-related conditions insofar as they would impact any pain management procedures.

   b.   Before Fall 2018, initial consults were only thirty minutes, giving physicians less time for comprehensive chronic condition care.

   c.   Thirty-minute procedure appointments, including facet injections. There is little discussion of any non-pain-related conditions unless any would affect the immediate procedure. During this appointment, Dr. Bicocca is performing a medical procedure.

   d.   Thirty-minutes follow-up discussion appointments on the effectiveness of the procedure and whether any anything else is needed, including a limited discussion of other conditions for their effect on the recovery.

108.   None of the appointments provide Bicocca and other physicians in his practice the time or opportunity to evaluate or manage any chronic conditions a patient may have. Dr. Bicocca has reason to believe that other specialty physicians at Permanente conduct their appointments in a similar manner and would also not have the time in any given appointment necessary to discuss, evaluate, or manage a patient's chronic conditions.

109.   Based on Relator's experience, patients typically spend 17 to 20 minutes with their pain management physicians during a procedure appointment, 25 minutes in a return

- 23 -

appointment, 25 minutes during initial consultations, and 40 minutes during initial consultations that occurred after Fall 2018, with five minutes of documentation time, none of which is enough time to describe, discuss, and cover the nearly two dozen chronic conditions listed above. Relator estimates that his own practice has longer appointments than the norm for specialists, which he believes are typically around 20 minutes each.

110.    Further, the "complex" CCM code requires that at least one hour of staff time per month must be directed towards a patient by the physician for the "complex" requirements to be met. This requirement cannot not be consistently met at Permanente and is never mentioned by Permanente trainings.

111.    Worse, even if they were given the time they needed, in theory, Bicocca and other specialist physicians do not have the expertise to fully advise their patients on the various ailments that are listed above.

112.    Each of these conditions in themselves require years of study and training in order to conduct a proper consultation or follow up appointment.

113.    For example, a pain management specialist does not have the neurological and psychological training or credentials to conduct a full review of a patient's Alzheimer's or schizophrenia. A pain management specialist could not effectively review or manage a patient with heart failure, atrial fibrillation, ischemic heart disease, hyperlipidemia, and hypertension the way that a cardiologist could. Typically, only a primary care physician or pulmonologist could manage asthma or chronic obstructive pulmonary disease in the manner described by the CPT codes.

114.    In fact, the only condition initially Bicocca felt even nominally comfortable discussing with patients is diabetes, even though he is not an endocrinologist. However, Dr. Bicocca would discuss a patient's diabetes but only to the extent that such a condition would

- 24 -

affect the patient's pain management procedure, not a full evaluation with moderate or high complexity in medical decision-making as is required by the complex chronic condition management code.

115.     Upon reading Medicare's requirements, Bicocca realized that he was not qualified to even discuss diabetes by CMS's standards, and that he only felt comfortable with the topic under the false training provided by Defendants.

116.     In fact, very few specialists could cover more than just a few of the chronic conditions listed above, and none of the other pain management physicians in Bicocca's office could do so.

117.     Reviewing the relevant regulations shows the absurdity of the requirements as laid out by Permanente. For example, a comprehensive care plan needs to be established for CCM, but no physician would be qualified to establish one except for the specific chronic conditions they specialize in. Very few physicians would be able to set up a comprehensive care plan for every patient for 90% of the conditions as Defendants require.

118.     Bicocca and his fellow physicians are instructed to certify something they have neither the expertise nor time to certify that every patient who comes into the South Sacramento Medical Center is given a comprehensive assessment of all their chronic conditions, all to Permanente's benefit.

119.     The result of this essential impossibility for adding on a CCM treatment to every appointment with Medicare and public benefits patients at Permanente is that every physician is either misled into or forced into falsely certifying compliance with CCM requirements for the purposes of increased reimbursement to Defendants.

120.     This billing tactic affects all Medicare and CalPERS patients who receive treatment at any Permanente facility.

COMPLAINT

CASE NO. _____

121.    In addition, the training in fraudulent documentation Relator and his fellow physicians received is also occurring at Southern California Permanente and could exist at other Permanente groups, suggesting a common source from the Permanente Federation.

122.    Physicians at Permanente achieved a 96% "success rate" for certifying CCM from January through September 2019.

### b. Bicocca Raises Concerns About Permanente's Unlawful Practices

123.    Over the course of multiple mass emails and several regular trainings, Bicocca and other physicians received an instruction to include every problem that qualifies as chronic for a patient in that patient's chart after the appointment.

124.    In or around 2015, Guardino gave the first mandatory educational meeting at South Sacramento Medical Center. His original statement, mirrored by the PowerPoint presentation he showed the audience, was something to the effect of "for this new billing process, you must check and discuss every chronic condition, and then you're done."

125.    The implication here is that any mention of a condition by the physician or patient, even inquiring if the patient has the condition, warranted certification that the chronic conditions were managed by CMS guidelines.

126.    In or around 2015, another trainer stated that if a patient states in response to a question that he or she is taking medication for a certain condition, this would satisfy the CCM requirements. This is in direct contradiction to the foregoing guidelines.

127.    Relator immediately reached out to the training staff after the session was complete to note that the training materials could not possibly be accurate, as they imply that Permanente is asking physicians to manage conditions that they have no time nor expertise to manage.

128.    Over time, the training staff responded, only to Bicocca, that he was only to manage chronic conditions he was "comfortable with," such as diabetes. This seemed to be a softening of their position, until they stated that he was required to be "comfortable with" 95% of the conditions listed above. The clarification in Permanente's requirement for physicians was only given to Bicocca after he pushed back, it was not distributed to all physicians who previously received training to certify CCM if the patient so much as mentioned they were on medication for a chronic condition.

129.    Worse, Defendants, through training staff and regular check in meetings, implied that physicians would be disciplined or otherwise adversely acted upon if they did not meet this threshold. Examples of this were a reduction of bonus.

130.    After the first training, in which physicians were told by the training staff from Permanente that they needed to check nearly every box showing stability in the patient's chronic condition, Permanente sent non-physician trainers to every department to ensure that this directive was being followed.

131.    At one point, the trainers specifically told Bicocca that a patient who was taking an antidepressant qualified to be marked as "stable" under the chronic condition of depression. Relator told the trainers that taking an antidepressant is in no way proof that a patient is stable in that area, and that he could not determine such a thing, since he is not a psychiatrist or a primary care physician.

132.    Every week, the administrative chiefs of every department received emails detailing which doctors were not checking at least 90% of the listed chronic conditions with every patient.

133.    In meetings between department chiefs, the group would discuss which departments were most successful in meeting this criterion.

- 27 -

134. At one point in time, the highest achieving department in South Sacramento was Orthopedic Surgery, where most of the physicians would not have the clinical expertise to manage these conditions to the extent required by CMS.

135. As the Chief of Pain Management at the time, other physicians under Bicocca's supervision brought concerns to Bicocca about the practice.

136. On August 11, 2015, shortly after another meeting in which Bicocca was given the suspect training, Bicocca called Manager of Financial Services Jeremy Lawrence to express his concerns about the CCM mandate Defendants were requiring.

137. Lawrence immediately forwarded these concerns to Serene Tran, Guardino, and Keshia Redmond, stating: "Dr. Bicocca indicated that he was told during the meeting today that .FOL had changed to indicate more of a 'yes, I confirm these conditions are still listed in Healthconnect' type of statement. *He is concerned about fraud* since it's unlikely that he (or most other specialists) won't actually ask about or address conditions outside of what they are treating the patient for." (emphasis added).

- 28 -

Jeremy Lawrence        Hello Serene & Keshia - I just received a call fro...        08/11/2015 01:09:12 PM

From:        Jeremy Lawrence/CA/KAIPERM
To:          Serene N Tran/CA/KAIPERM@Kaiperm, Keshia Y Redmond/CA/KAIPERM@KAIPERM
Cc:          Michael J Bicocca/CA/KAIPERM@Kaiperm, Jason M Guardino/CA/KAIPERM@KAIPERM
Date:        08/11/2015 01:09 PM
Subject:     .refresh - clarification needed

Hello Serene & Keshia -

I just received a call from Dr. Bicocca in Pain Management seeking clarification on the use of .REFRESH, specifically around the language provided by .FOL.

.FOL seems to be a bit too specific in his opinion by implying that the physician actually confirmed the presence of the condition by way of conversation with the patient or by review of the medical record.  Dr. Bicocca indicated that he was told during the meeting today that .FOL had changed to indicate more of a "yes, I confirm these conditions are still listed in Healthconnect" type of statement.

He is concerned about fraud since it's unlikely that he (or most other specialists) won't actually ask about or address conditions outside of what they are treating the patient for.  Can you please offer clarification on this?  thank you

Jeremy Lawrence, MBA
Manager, Medical Office Financial Services
TPMG Controller's Office, South Sacramento Medical Center
Mobile - (916) 956-9815 / Work - (916) 525-3028 tie 8-415 / Fax - (916) 525-3091 tie 8-415

NOTICE TO RECIPIENT:  If you are not the intended recipient of this e-mail, you are prohibited from sharing, copying, or otherwise using or disclosing its contents.  If you have received this e-mail in error, please notify the sender immediately by reply e-mail and permanently delete this e-mail and any attachments without reading, forwarding or saving them.  Thank you.

138.    Guardino responded on the same day, stating that simply asking if the patient has

a condition is enough to mark the condition as having been managed.

COMPLAINT

CASE NO. _____



1

2 **{In Archive} Re: .refresh - clarification needed**
   Jason M Guardino   to: Jeremy Lawrence                                    08/11/2015 01:16 PM
3      Cc: Keshia Y Redmond, Michael J Bicocca, Serene N Tran

4  Each physician should ask about these... It's simply 'you have athlerosclerosis correct Mr. Smith'.
   If they don't know, and it's on a CT, then its fine... (in this example).

5  Also... a key point. Lets say a person has hx of breast cancer and has nothing to do with a pain block in
   the leg whatsoever.
6  The fact that you thought about it has nothing to do with this pain block, is a way of acknowledging it as
   well.
   In other words, you thought about how it has no bearing on this procedure.
7  Just as if you would think about something having a bearing on doing the procedure.
   i.e. both pertinent positives and negatives.
8
   Hope that makes sense.
9
   Also, FOL is a regional phrase passed by many lawyers and others in region.
10
   Thanks.
11

12        139.    Tran's answer repeated that simply asking about and reviewing the diagnosis

13  would be enough, if one's medical judgment was "implicitly" influenced by the diagnosis.

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

COMPLAINT
CASE NO. _____

Serene N Tran        "I have confirmed the presence of the above clini...        08/11/2015 01:24:31 PM

From:       Serene N Tran/CA/KAIPERM
To:         Jeremy Lawrence/CA/KAIPERM@KAIPERM
Cc:         Jason M Guardino/CA/KAIPERM@Kaiperm, Keshia Y Redmond/CA/KAIPERM@Kaiperm, Michael
            J Bicocca/CA/KAIPERM@Kaiperm
Date:       08/11/2015 01:24 PM
Subject:    Re: .refresh - clarification needed

"I have confirmed the presence of the above clinical diagnoses, which were considered
in the current and ongoing care of the patient. At the time of this visit, the medical
record indicates, and/or the patient states, that there are no changes in these

conditions unless otherwise noted. As treatment warrants, the patient has been advised
to follow up with her PCP or appropriate specialist. "

Above is the revised version of the .FOL which is included in our .REFRESH smartphrase.

What I take from this is that as long as you review the chart (problem list, medication list, and/or labs)
when you see the patient, you can confirm that the patient has the diagnosis and the decision you make
will be influenced (explicitly or implicitly) by the patient's medical history.
Also, the revised version included the phrase "as treatment warrants" to imply that if there is no change of
treatment needed, you do not need to advise the patient to follow up with pcp or specialist.

I hope this helps.

Serene

**NOTICE TO RECIPIENT:** If you are not the intended recipient of this e-mail, you are prohibited from sharing, copying, or otherwise
using or disclosing its contents. If you have received this e-mail in error, please notify the sender immediately by reply e-mail and
permanently delete this e-mail and any attachments without reading, forwarding or saving them. Thank you.

140.    Bicocca responded to these emails on August 13, 2015, by pointing out the lack of

consistency between Guardino and Tran, along with the lack of consistency between what was

discussed via email, and what had been discussed earlier during trainings, when the requirements

were implied to be even looser.

141.    Bicocca then asked "[w]hy are we promoting the use of a phrase we know is

making our medical documentation incorrect. I think that is fraud."

- 31 -

From:        Michael J Bicocca/CA/KAIPERM
To:          Serene N Tran/CA/KAIPERM@Kaiperm
Cc:          Jeremy Lawrence/CA/KAIPERM@KAIPERM, Jason M Guardino/CA/KAIPERM@KAIPERM,
             Keshia Y Redmond/CA/KAIPERM@KAIPERM
Date:        08/13/2015 05:49 PM
Subject:     Re: .refresh - clarification needed

I hate to be a thorn but it does not help. All my MDs feel the same as I do about this.

I can see that reading the problem list is considering the diagnosis, but the rest of the statement is not true based on the work flow we discussed the other day.

At the time of this visit, the medical record indicates, and/or the patient states, that there are no changes in these conditions unless otherwise noted.

    That statement says I either reviewed the chart or discussed with the patient to determine that these conditions have "no changes". I am not doing that when "I consider breast cancer" before doing an injection. Nor am I doing that when I review their medications or read the problem list. I'll hypothesize that no one besides a PCP is doing that.

As treatment warrants, the patient has been advised to follow up with her PCP or appropriate specialist
    For this to be true I would have to tell every patient to follow up with their PCP or specialist at every appointment I use this phrase. Jason are you saying that to patients?

Jason do you really ask every patient if they have every problem on the problem list?

I just can't imagine that MDs are doing all the things that would be required to make this a true statement. Let's be realistic. I doubt the attorneys said this was OK if the MDs aren't doing it. Why are we promoting the use of a phrase we know is making our medical documentation incorrect. I think that is fraud.

Serene, asking the patient if they have every problem on the problem list, telling them to follow up if needed and confirming that these conditions are stable, is not what you said we needed to do. I was real clear in asking and what all of my MDs heard is that all we were doing is confirming that these diagnoses are on the problem list. The work flow Jason is suggesting is drastically different.

Mike

    142.    Guardino, pushed back with his own email, reproduced below, and the practices have continued. Guardino's email glosses over the actual requirements by CMS as written down in the CPT codes, and instead dissects the certification that Permanente pressures physicians into using.

- 32 -

{In Archive}  Re: .refresh - clarification needed
Jason M Guardino   to:  Michael J Bicocca, Steve Olson                                    08/14/2015 08:01 AM
Cc:  Serene N Tran, Jeremy Lawrence, Keshia Y Redmond

History:                     🔏 This message has been replied to and forwarded.

Jeremy/Keshia.... Can you both meet with Mike and his group.
It seems he does not understand the issue(s).

Mike,
I'm going to encourage you to read this email a few times to help clarify.  I think you don't understand the issues.

Step 1.
Any doctor should always review the Active Problem List (APL), meds, allergies, just like vital signs.  I think you agree.  I hope you agree.

Step 2.
MDP form is the gold standard.
If a patient has 20 problems on the APL.... while you should review them all because it is good medicine ... if the MDP form only has 3 of those 20... those are the three you code.  NOT ALL 20!

Step 3.
Lets say pt has DM and hx of Breast cancer (and these appear on the MDP form) and 5 other diagnosis are NOT on the MDP form (while you should reviews these other 5 for the practice of good medicine, they do not need to be coded).
So you move ONLY DM and Hx of Breast cancer (the ones on the MDP form) over from right to left and at end of your note type .Refresh.

[Let me interject here that if you are completely uncomfortable coding a diagnosis because you are simply in no way familiar with it (lets say it is 1 of the 5 dx on the MDP form)  Then you code the four you feel comfortable and then route your note to the PCP and say, I coded 4 of the 5 diagnosis, but I don't feel comfortable with XYZ dx - then PCP can do when they see patient - this would hopefully be rare instance].

Now.
Let's dissect the phrase knowing that it applies only to the ones you coded and moved over that corresponded to the MDP form. In this case DM and Hx of Breast Cancer.

*I have confirmed the presence of the above clinical diagnoses, which were considered in the current and ongoing care of the patient.*

So you are telling me that when a patient presents for pain block and has a history of breast cancer you don't think for one second ..... "hmmmm maybe this is metastatic breast cancer?  But not likely because they are 5 years out and saw onc recently", for example.  You are not thinking... "maybe this is DM radiculopathy?"  What if a patient has a history of BKA.... has nothing to do with RUE pain for example.  Weather you thought about these as pertinent positives or negatives, I hope you thought about them and asked the patient about them.  And yes.. I do ask  Before I do a colonoscopy you bet your colo I look at the APL, allergies, meds, etc and think about what reactions they might have to conscious sedation or polypectomy, etc.  In fact I ask almost every patient "do you take any medications called plavix or coumadin"... even though it is not on their list at all!!

*At the time of this visit, the medical record indicates, and/or the patient states, that there are no changes in these conditions unless otherwise noted.*

- 33 -

Again... I don't know what to tell you if you are not asking about DM or Hx of breast cancer if you are doing a block for pain.... I ask people about 'I know you had breast surgery... any surgery on your belly' before I do a cscope.

The medical record indicates... if you saw a note from onc during your chart review (hopefully you are doing some limited chart review) that says patient is five years out of breast cancer and clear.... the medical record indicates.  You don't need to ask it if you don't want to.

_**As treatment warrants, the patient has been advised to follow up with her PCP or appropriate specialist.**_

As treatment warrants.... means if it is clinically indicated.  If DM is totally in control then treatment is not warranted.  If it is not in control..... you don't say 'DM radiculopopathy may cause you more pain some day and you need to get your DM in control'.  Why not?
If that was your relative you wouldn't want a pain doc (or any other doc) telling them they should stop smoking for example?

I'm confused.  Your email sounds like some doctors are robots without thinking and then do their jobs in isolation... that is poor quality.
At the end of the day... coding ensures high quality of care - it ensures problems are being dealt with.... and that things don't fall through the cracks.  Yes, it takes a few extra minutes.  But I think most doctors need to start treating the whole patient... not only a nerve that causes some pain.  It's far from fraud Mike, if done right with thoughtful purpose.  As a chief I hope you are not poisoning the well of your docs with this and instead looking at this through a different lens of making sure the entire patient is being treated.

Thanks.
jason


Jason M. Guardino, DO, MS Ed., FACP
Asst. Physician in Chief (APIC) - Quality
Chief - Dept. of Gastroenterology
Kaiser - Permanente Medical Center, SSC.
6600 Bruceville Road
Sacramento, California  95823
Office: 916-688-6675 / Tie line: 8-527-6675
Mobile: 916-224-8448

NOTICE TO RECIPIENT:  If you are not the intended recipient of this e-mail, you are prohibited from sharing, copying, or otherwise using or disclosing its contents.  If you have received this e-mail in error, please notify the sender immediately by reply e-mail and permanently delete this e-mail and any attachments without reading, forwarding or saving them.  Thank you.

143.    The last set of emails from Bicocca include Regional Physician Director of

Clinical Documentation and Coding Dr. Steve Olson, who these concerns were escalated up to

afterwards.

144.    Dr. Olson oversaw training physicians on the CCM certification for Permanente.

145.    Olson responded by stating, again not engaging with the substance of Bicocca's

worries: "if someone is on an anti depressant, and has a prior diagnosis of depression, it may not

be out of scope to ask if the patient is still taking the medication for depression that is listed on

COMPLAINT

CASE NO. _____

the medication list. If the patient says yes, and relates that s/he is being followed by PCP, etc, then would feel comfortable using the .FOL statement."

146.    Once again, Olson's response was markedly different and more stringent than what Bicocca was told during trainings, but still essentially recommended that physicians mark diagnoses and their management simply by asking patients about their conditions.

147.    In one of the few instances in which Relator Bicocca was able to speak directly with Dr. Olson. Olson told Bicocca something to the effect of "of course Mike, if you don't know anything about hypoparathyroidism then don't code it." However, Olson then told Bicocca that he was expected to "know" about 90% of the listed conditions.

148.    Relator Bicocca again attempted to raise up the issue and clarify the legality of the certification he has been told to insert into his medical notes in September 2017.

149.    On September 18, 2017, Relator wrote to Jason Gritti, the doctor who was then responsible for trainings at South Sacramento, as well as Galina Flury and Keshia Redmond, to confirm what the coder who visited his office said was correct: "She said as long as we 'address' the problems and she was clear that all that needs is to confirm they were on a medication for that problem and tell them to follow up with the treating MD if needed. We could then include the visit diagnoses and a statement saying, 'these diagnoses were addressed today and the patient was told to follow up with their treating provider if needed'." This was the same instruction Bicocca spent weeks clarifying with Dr. Olson in 2015.

150.    Gritti responded on the same day, stating "If you specifically address each item e.g. Migraine: continue topomax [sic] and follow up with the pcp as needed, then that is quite alright as well. You would just have to ensure you address each and every separate coded item."

151.    Gritti is essentially telling Relator Bicocca that, if he asks the patient about the condition, whether the patient is taking medication, and telling them to follow up with another

- 35 -

1   physician on that condition, that he could write the certificate and that Permanente would code to

2   either of the foregoing CPT codes.

3       152.    This is false based on the plain meaning of the CPT code requirements, including

4   the requirements for a comprehensive plan, for a certain minimum amount of time spent, and

5

6   moderate to high complexity medical decision-making.

    **X. Conclusion**

7

8       153.    "Under Medicare Advantage's capitation system, private health insurance

9   organizations provide Medicare benefits in exchange for a fixed monthly fee per person enrolled

10  in the program—regardless of actual healthcare usage. These organizations pocket for

11  themselves or pay out to their enrollees' providers the difference between their capitation

12  revenue and their enrollees' medical expenses, creating an incentive for the organizations to rein

13
    in costs. Unfortunately, human nature being what it is, Medicare Advantage organizations also
14
15  have some incentive to improperly inflate their enrollees' capitation rates, if these organizations

16  fall prey to greed." *United States ex rel. Anita Silingo v. WellPoint, Inc.*, 904 F.3d 667 (2018)

17  (internal citations omitted).

18      154.    A common form of fraud, one that is occurring here, is falsely claiming to give

19  patients a level of service that they are not providing, and simply pocketing more of the

20  capitation rate than one should.

21
        155.    By explicit setting up separate requirements for physicians treating Medicare
22
23  beneficiaries and patients with other public benefits plans differently than private pay or

24  employer-based insurance, Defendants demonstrate knowledge that the certification regarding

25  CCM is material to the Government's decision to pay increased reimbursement for public

26  benefits beneficiaries.

27

28
                                      - 36 -

156.   On a mass scale, with every physician ordered to certify CCM work without performing it, Permanente is able to collect capitation rates from CMS for comparatively little work.

157.   In this manner, Defendants submit false claims to the government when they bill for chronic care management even though not all elements of this billing code are satisfied.

158.   Defendants were aware of the issues with this method of billing due to Bicocca raising the concerns of multiple physicians related to this issue.

159.   Defendants submit false claims to the government when they bill visit codes that show false documentation.

160.   Defendants' misrepresentations are material to the government's decision to continue paying Defendants its capitation rate under the assumption patients are getting the care they need.

161.   As a result, the government and the state have been damaged in a yet to be quantified amount.

**COUNT I**
**Defendant Knowingly Presents, or Causes to be Presented**
**False Claims**
**31 U.S.C. § 3729(a)(1)(A)**

162.   Relator reasserts and incorporates by reference all paragraphs set forth above as if restated herein.

163.   31 U.S.C. § 3729(a)(1)(A) subjects to liability any person or entity that "knowingly presents, uses, or causes to be presented, a false or fraudulent claim for payment or approval."

164.   Relator has first-hand knowledge of services that could not have been provided but for which Defendants billed.

- 37 -

165.   Defendants knowingly presented or caused to be presented to the United States, false or fraudulent claims, and knowingly failed to disclose material facts, in order to obtain payment or approval under the federally funded Medicare program in violation of 31 U.S.C. § 3729(a)(1)(A).

166.   For each of the services described, Defendants knowingly submitted claims and received payment from the United States of America through CMS for services that were not provided to Medicare beneficiaries.

167.   The United States of America has been damaged by all the misrepresentations and failures to comply with requisite laws and regulations in an as of yet undetermined amount.

**COUNT II**
**Defendant Knowingly Made, Used, or Caused to be Made or Used,**
**False Records or Statements Material to False Claims**
**31 U.S.C. § 3729(a)(1)(B)**

168.   Relator reasserts and incorporates by reference all paragraphs set forth above as if restated herein.

169.   The False Claims Act imposes liability on any person who knowingly makes, uses, or causes to be made or used a false record or statement material to a false or fraudulent claim. 31 U.S.C. § 3729(a)(1)(B).

170.   As a result of Defendants' actions, the Government paid funds from the Medicare Advantage program for capitation rates covering services not actually rendered.

171.   As a result of Defendants' actions, the Government paid funds from the Medicare programs for services that were not or could not be performed.

172.   Defendants knowingly made or used false records material to false claims when they, among other things, created records that indicated physicians rendered appropriate case management services, when in fact, appropriate case management services were not rendered to patients.

- 38 -

173.    The United States of America has been damaged by all the misrepresentations and failures to comply with requisite laws and regulations in an as of yet undetermined amount.

## COUNT III
### California False Claims Act Violations
### Pursuant to Cal. Gov't Code § 12651(a)(1)
### Knowingly Submitting False Claims for Payment

174.    Relator reasserts and incorporates by reference all paragraphs set forth above as restated herein.

175.    Defendants, individually and through the acts of their agents, servants, officers, and employees, knowingly presented, or caused to be presented, to an officer or employee of the California government, false or fraudulent claims for payment or approval under the CalPERS program in violation of Cal. Gov't. Code § 12651 (a)(1).

176.    Defendants knowingly presented, or caused to be presented, to an officer or employee of the California government, false or fraudulent claims for payment or approval under the CalPERS program in violation of Cal. Gov't. Code § 12651 (a)(1).

177.    Cal. Gov't. Code § 12651 (a)(1) imposes liability on a person or entity that knowingly presented, or caused to be presented, to an officer or employee of the California government, false or fraudulent claims for payment or approval.

178.    The government of California, unaware of the falsity of the claims made by Defendants and in reliance on the accuracy thereof, paid Defendants for such false or fraudulent claims.

179.    Defendants violate Cal. Gov't. Code § 12651 (a)(1) when they bill for services rendered for chronic care management when those services were not provided.

180.    The claims submitted by Defendants are material to the state of California's decision on whether, and how much, to pay Defendants for services provided to CalPERS beneficiaries.

181.   By reasons of the acts and conduct of Defendants in violation of Cal. Gov't. Code § 12651 (a)(1), the government of California has suffered actual damages, including the amounts paid in response to all such false or fraudulent claims for payment.

182.   The state of California is entitled to recover civil money penalties, and other monetary relief as deemed appropriate.

**COUNT IV**
**California False Claims Act Violations**
**Pursuant to Cal. Gov't Code § 12651 (a)(2)**
**Knowingly Making False Records Material to a False Claim**

183.   Relator reasserts and incorporates by reference all paragraphs set forth above as restated herein.

184.   Defendants, individually and by their own acts, or through the acts of their agents, servants, officers, and employees, knowingly made, used, or caused to be made or used, a false record or statement material to a false or fraudulent claim in violation of Cal. Gov't Code § 12651 (a)(2).

185.   Defendants knowingly made, used, or caused to be made or used, a false record or statement material to a false or fraudulent claim in violation of Cal. Gov't Code § 12651 (a)(2).

186.   Defendants violate Cal. Gov't Code § 12651 (a)(2) when they knowingly made or used false records material to false claims when they, among other things, created records that indicated physicians rendered appropriate case management services, when in fact, appropriate case management services were not rendered to patients.

187.   At all relevant times, Defendants were aware of, and displayed a conscience and reckless disregard for, the applicable CalPERS rules and regulations regarding the submission of claims for payment.

- 40 -

188.     The false statements created and submitted by Defendants is material to the state's decision on whether, and how much, to pay Defendants for services provided to CalPERS beneficiaries.

189.     By reasons of the acts and conduct of Defendants in violation of Cal. Gov't Code § 12651 (a)(2), the State of California has suffered actual damages, including the amounts paid in response to all such false or fraudulently supported claims for payment.

190.     The state of California is entitled to recover civil money penalties, and other monetary relief as deemed appropriate.

## **PRAYER FOR RELIEF**

WHEREFORE, Relator Michael Bicocca, acting on behalf of and in the name of the United States of America and the State of California, and on his own behalf, pray that judgment be entered against Defendants for violation of the False Claims Act as follows:

(a) In favor of the United States and State of California against the Defendants for treble damages to the federal government from the submission of false claims, and the maximum civil penalties for each violation of the False Claims Acts and California False Claims Act;

(b) In favor of the Relator for the maximum amount pursuant to 31 U.S.C. § 3730(d) to include reasonable expenses, attorney fees, and costs incurred by the Relator;

(c) For all costs of the False Claims Act and California False Claims Act civil action; and

(d) In favor of the Relator, the United States, and California for further relief as this court deems just and equitable.

- 41 -

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

## DEMAND FOR A JURY TRIAL

Pursuant to Rule 38 of the Federal Rules of Civil Procedure and pursuant to the local

rules of this Court, Relator demands a jury trial as to all issues so triable.

February 5, 2020                              Respectfully submitted,


                                    _____s/ Gail A. Glick_____
                                    Gail A. Glick (California Bar No. 174293)
                                    Alexander, Krakow & Glick LLP
                                    1900 Avenue of the Stars, Suite 900
                                    Los Angeles, California 90067
                                    (310) 394-0888
                                    (310) 394-0811 (facsimile)
                                    gglick@akgllp.com
                                    *Counsel for Plaintiff-Relator*

                                    R. Scott Oswald (to be admitted *pro hac vice*)
                                    soswald@employmentlawgroup.com
                                    Janel E. Quinn (to be admitted *pro hac vice*)
                                    jquinn@employmentlawgroup.com
                                    The Employment Law Group, P.C.
                                    888 17th Street, NW, Suite 900
                                    Washington, D.C. 20006
                                    (202)261-2806
                                    (202) 261-2835 (facsimile)
                                    *Counsel for Plaintiff-Relator*

- 42 -

COMPLAINT
CASE NO. _____