1  J. Bernard Alexander III (State Bar No. 128307)
2  ALEXANDER MORRISON + FEHR LLP
   1900 Avenue of the Stars, Suite 900
3  Los Angeles, California 90067
   (310) 394-0888
4  (310) 394-0811 (facsimile)
   balexander@amfllp.com
5  Counsel for Plaintiff-Relator

6  R. Scott Oswald (to be admitted pro hac vice)
7  soswald@employmentlawgroup.com
   Janel Quinn (admitted pro hac vice)
8  jquinn@employmentlawgroup.com
   The Employment Law Group, P.C.
9  888 17th Street, NW, Suite 900
   Washington, D.C. 20006
10 (202) 261-2806
   (202) 261-2835 (facsimile)
11 Counsel for Plaintiff-Relator

12

**FILED**

**Oct 09, 2020**

CLERK, U.S. DISTRICT COURT
EASTERN DISTRICT OF CALIFORNIA

**SEALED**

13

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF CALIFORNIA**
**Sacramento Division**

14

15  UNITED STATES OF AMERICA AND THE
    STATE OF CALIFORNIA, *ex rel.*

16

17  MICHAEL BICOCCA
        2530 Highland Hills Drive
18      El Dorado Hills, CA 95762

19              *Plaintiff,*

20  v.

21  PERMANENTE MEDICAL GROUP, INC.
        1950 Franklin Street, 18th Floor,
22      Oakland, CA 94612

23  SOUTHERN CALIFORNIA PERMANENTE
24  MEDICAL GROUP, INC.
        393 Walnut Drive,
25      Pasadena, CA 91107

26  THE PERMANENTE FEDERATION, LLC.
27      One Kaiser Plaza,
        27th Floor,
28      Oakland, CA 94612

**Case No. 2:20-cv-296**

**FILED UNDER SEAL**

**FIRST AMENDED COMPLAINT FOR
VIOLATIONS OF THE FALSE CLAIMS
ACT, 31 U.S.C. §§ 3729, *et seq.; AND THE
CALIFORNIA FALSE CLAIMS ACT,
CAL. GOV'T CODE §§ 12650, *et seq.*

**JURY TRIAL DEMANDED**

- 2 -

KAISER FOUNDATION HEALTH PLAN, INC.
  One Kaiser Plaza Suite 15L,
  Oakland, CA 94612

   *Defendants.*

# FIRST AMENDED COMPLAINT

### I. Introduction

1. *Qui tam* relator Michael Bicocca ("Relator"), through his attorneys, individually, and on behalf of the United States of America and the State of California, files this First Amended Complaint against the above-named Defendants to recover damages, penalties, and attorneys' fees for violations of the federal False Claims Act ("FCA"), 31 U.S.C. §§ 3729 *et seq.*, and the California False Claims Act ("CFCA"), Cal. Gov't Code § 12651 *et seq.*

2. Defendants require Permanente physicians to record that their Medicare and California Public Employees' Retirement System ("CalPERS") patients have chronic conditions, and that the physician discussed and adequately considered the patients' chronic condition during the physicians' treatment. This diagnosis and management recordation is required of all Permanente physicians regardless of whether the physician has the appropriate training, skills, or expertise to identify much less address the specific chronic conditions.

3. Additionally, Defendants training instructs Permanente physicians to indicate diagnosis and management of their patients' chronic conditions whether the physician actually diagnosed, confirmed, or managed the condition.

4. As will be described below, the Kaiser defendants then use these diagnoses and statements to inflate the risk adjustment scores submitted to Medicare and CalPERS to receive inflated capitation payments from the United States and the State of California.

5.      Because the risk adjustment data Defendants submit or cause to be submitted to Medicare and CalPERS for continued capitation rates intentionally and falsely states that the patients' chronic conditions were properly diagnosed and were effectively managed, Defendants receive additional, undeserved capitation amounts.

**II.  Jurisdiction and Venue**

6.      This Court has subject matter jurisdiction over this action under the FCA because it is an action arising under the laws of the United States, specifically 31 U.S.C. § 3730(b).

7.      This Court has personal jurisdiction over Defendants pursuant to 31 U.S.C. § 3732(a) because Defendants transact business in this judicial district.

8.      Venue is proper in this Court under 28 U.S.C. § 1391(c) and 1395(a) because illegal acts occurred within this judicial district, Defendants are resident of this district, and because Defendants transact business within this judicial district.

9.      This Court has personal jurisdiction over Defendants because the Defendants are in the State of California.

**III. Parties**

10.     Relator Bicocca is an anesthesiologist with more than 20 years of experience. Bicocca holds a Bachelor of Science degree from California Polytechnic State University in San Luis Obispo and earned his MD from Northeastern Ohio Universities Colleges of Medicine and Pharmacy.[1] Bicocca completed his residency at the University of California, Davis, and did a fellowship at Massachusetts General Hospital in Boston.

11.     Bicocca served as Chief of Pain Management for Kaiser Hospitals in Modesto, Stockton, and South Sacramento, California, before he voluntarily stepped down to return to

---

[1] Northeastern Ohio Universities Colleges of Medicine and Pharmacy is now known as Northeast Ohio Medical University (NEOMED).

- 4 -

medical practice full-time. Bicocca subsequently worked as a pain management physician at Kaiser's South Sacramento facility until he retired in December 2019.

12.     Bicocca's practice focused primarily on pain management. Pain management includes, but is not limited to, management of chronic pain, including facet joint injections.

13.     The Permanente Federation, LLC, (Permanente Federation) is a network of corporations that employs thousands of physicians. These corporations are not legally affiliated with each other. However, the Permanente groups' upper level management frequently comingle between firms. For example, Rich Isaacs, CEO and Executive Director of Permanente Medical Group, is also the President and CEO of Mid-Atlantic Permanente, while also working as Co-Chief Executive Officer of the Permanente Federation.

14.     Through the Permanente Federation, the heads of the other Permanente branches coordinate on larger business decisions and plans, while sharing best practices.

15.     Permanente Federation contracts with Kaiser to provide physicians to Kaiser hospitals and the Kaiser insurance group. Permanente Federation provides services exclusively to Kaiser.

16.     One of the corporations within the Permanente Federation network is Permanente Medical Group ("Permanente"), which has twenty one (21) locations in California, including: Antioch, Fremont, Fresno, Modesto, Oakland, Redwood City, Richmond, Roseville, Sacramento, San Francisco, San Jose, San Leandro, San Rafael, Santa Clara, Santa Rosa, South Sacramento, South San Francisco, Stockton, Vacaville, Vallejo, and Walnut Creek.

17.     Permanente serves as both the Northern California regional group and as the flagship group of the Permanente Federation. Permanente is based in Northern California and is the largest Permanente Medical physicians' group, with more than 25,000 employees.

18.     About one third of Permanente's patients are Medicare recipients who are covered by Kaiser under Medicare Part C plans.

19.     Southern California Permanente Medical Group, Inc. is the Permanente group within the Permanente Federation responsible for administering medical care to Southern California residents.

20.     Kaiser Foundation Health Plan, Inc. is a nonprofit organization and a Medicare Advantage plan called Kaiser Permanente Senior Advantage. The Kaiser Permanente Senior Advantage offers several plans throughout its Regions. Kaiser Foundation Health Plan maintains Regions in Northern California, Southern California, Colorado, Georgia, Hawaii, Maryland, Oregon, Virginia, Washing, and Washington, D.C.

## IV. Medicare Overview

21.     In 1965, Congress enacted Title XVIII of the Social Security Act under 42 U.S.C. § 1395, *et seq.* ("The Medicare Program" or "Medicare") authorizing the federal government to pay for the cost of certain medical services for persons aged 65 and older.

22.     The United States, through the Department of Health and Human Services ("HHS"), administers the Medicare program.

## V. Medicare Advantage Organizations under Medicare

23.     Medicare Part C, or Medicare Advantage, is a program in which CMS works closely with private companies, called Medicare Advantage Organizations (MAOs), to offer semi-private, semi-public plans that cover Medicare Part A and B services. Part C plans will sometimes also cover prescription drug benefits under Medicare Part D. *See U.S., ex rel. Osheroff v. HealthSpring, Inc.*, 938 F. Supp. 2d 724, 726 (M.D. Tenn. 2013).

24.     "The Centers for Medicare & Medicaid Services ('CMS') compensates MAOs at a capitated rate for the delivery of benefits. To participate in the Medicare Advantage program,

- 6 -

MAOs must submit bids to CMS every year in which they offer to provide services for a specified amount per member, per month. Each participating MAO must then enter into a contract with CMS, the terms of which require the MAO to comply with certain laws, including. . . . the [False Claims Act]. To receive payment for services provided under the Medicare Advantage program, MAOs must submit monthly payment requests to CMS along with monthly reports certifying that all information submitted to CMS in this report is accurate, complete, and truthful." *United States ex rel. Derrick v. Roche Diagnostics Corp.*, 318 F. Supp. 3d 1106, 1110 (N.D. Ill. 2018) (internal citations and quotations omitted).

25.     "[B]y statute CMS must pay Medicare Advantage insurers in a manner that ensures 'actuarial equivalence' with payments to traditional Medicare providers." *UnitedHealthcare Ins. Co. v. Azar*, No. CV 16-157 (RMC), 2020 WL 417867, at *1 (D.D.C. Jan. 27, 2020) (citing 42 U.S.C. § 1395w-23(a)(1)(C)(i)).

26.     "Traditional Medicare uses a fee-for-service payment model, whereby the more services physicians perform, the more money they earn. . . . Capitation means an amount is paid per person. Under Medicare Advantage's capitation system, private health insurance organizations provide Medicare benefits in exchange for a fixed monthly fee per person enrolled in the program—regardless of actual healthcare usage. These organizations pocket for themselves or pay out to their enrollees' providers the difference between their capitation revenue and their enrollees' medical expenses, creating an incentive for the organizations to rein in costs." *United States ex rel. Anita Silingo v. WellPoint, Inc.*, 904 F.3d 667, 672 (9th Cir. 2018) (internal citations and quotations omitted).

27.     "CMS calculates the payment for each enrollee based on various risk adjustment data, such as an enrollee's demographic profile and the enrollee's health status, as reflected in the medical diagnosis codes associated with healthcare the enrollee receives. These diagnosis

codes (also known as encounter data) are reported by Medicare Advantage organizations to CMS. Because Medicare Advantage organizations have a financial incentive to exaggerate an enrollee's health risks by reporting diagnosis codes that may not be supported by the enrollee's medical records, Medicare regulations require a Medicare Advantage organization, as an express condition of receiving payment, to certify (based on best knowledge, information, and belief) that the risk adjustment data it submits ... are accurate, complete, and truthful." *United States v. United Healthcare Ins. Co.*, 848 F.3d 1161, 1166 (9th Cir. 2016) (citing 42 C.F.R. § 422.504(*l*), (*l*)(2))). (internal quotations omitted).

28.     Simply put, Medicare Advantage is supposed to compensate these organizations for expected healthcare costs, paying "less for healthier enrollees and more for less healthy enrollees." *WellPoint, Inc.*, 904 F.3d at 672.

29.     Capitation rates are based largely on an individual's "risk adjustment data," which reflect several factors that can affect healthcare costs. *Id.* Chief among these data are individuals' medical diagnoses*. Id.*

30.     The method by which CMS calculates the capitated rate to Medicare Advantage organizations is described in greater detail below. *See Infra* at Section VII.

31.     Defendants' patients covered by public insurance programs are predominantly participants in the Kaiser Permanente Senior Advantage Enhanced Plan (HMO), which is a Medicare Part C plan that provides Medicare Part D benefits as well.

32.     Kaiser therefore receives a capitation rate from CMS for each Part C patient it covers. This rate is meant to cover the cost of care for the patient.

## VI. California Public Employees' Retirement System

33.     CalPERS is a retirement system created by statute, for the purpose of administering retirement, disability and death benefits for California state employees. Cal. Gov't Code § 20001 *et seq.*

34.     "CalPERS is a unit of the Government Operations Agency. In addition to administering the retirement system for employees of California and other public entities, CalPERS operates health insurance plans, including the PERS Choice health plan. . . ." *Orthopedic Specialists of S. California v. Pub. Employees' Ret. Sys.*, 228 Cal. App. 4th 644, 646 (2014) (quotations omitted).

35.     As a retiree, when a member first becomes eligible for Medicare, they must request a change from a CalPERS Basic Health Plan to a CalPERS Medicare Health Plan. When a CalPERS member retires and enrolls in Medicare Part A and Part B, CalPERS will work with the CMS to obtain the retiree's Medicare information and automatically transfer the retiree from a CalPERS Basic (non-Medicare) health plan to a CalPERS Medicare health plan.

36.     The CalPERS Medicare Health Plan requires Medicare to assume the role as the primary payer for health care costs, thus CalPERS members who receive health services result in expenditures to Medicare.

37.     At least 10% of the entire Permanente patient population is on the CalPERS program.

## VII.    Risk Adjustment Factors for Capitation Rate Calculations

38.     "CMS calculates the payment for each enrollee [in a MAO] based on various risk adjustment data, such as an enrollee's demographic profile and the enrollee's health status, as reflected in the medical diagnosis codes associated with healthcare the enrollee receives. These diagnosis codes (also known as encounter data) are reported by Medicare Advantage

- 9 -

organizations to CMS." *United Healthcare Ins. Co.*, 848 F.3d at 1166 (citing 42 C.F.R.

§ 422.504(l), (l)(2))).(internal quotations omitted).

39.     Capitation rates are based largely on an individual's "risk adjustment data," which

reflect several factors that can affect healthcare costs. Chief among these data are individuals'

medical diagnoses. *WellPoint, Inc*., 904 F.3d at 672.

40.     "Risk adjustment using diagnoses provides more accurate payments for MA

organizations, with higher payments for enrollees at risk for being sicker, and lower payments

for enrollees predicted to be healthier." CMS, Pub. No. 100-16, Medicare Managed Care

Manual, ch. 8, § 50 (2014), https://www.cms.gov/Regulations-and-

Guidance/Guidance/Manuals/Downloads/mc86c08.pdf.

41.     "The [Balanced Budget Act of 1997] and later legislation required CMS to adjust

per-beneficiary capitation payments with a risk adjustment methodology using diagnoses to

measure relative risk due to health status instead of just demographic characteristics such as age,

sex, and Medicaid eligibility." *Id.*

42.     "Effective January 1, 2005, CMS implemented the ESRD CMS-HCC models

based on diagnoses from inpatient, outpatient, and physician settings, and distinguishing dialysis,

transplant, and functioning graft statuses." *Id.*

43.     "The CMS-HCC models function by categorizing International Classification of

Diseases codes into disease groups called Hierarchical Condition Categories (HCCs). Each HCC

includes diagnosis codes that are related clinically and have similar cost implications. The CMS-

HCC models are prospective in the sense that they use diagnosis information from a base year to

predict costs for the next year. Models of this type are largely driven by the costs associated with

chronic diseases, and they capture the systematic risk (costs) associated with Medicare

populations." *Id.*

44.     CMS uses "CMS-HCC risk adjustment models . . . to calculate risk scores, which predict individual beneficiaries' health care expenditures, relative to the average beneficiary. Risk scores are used to adjust payments and bids based on the health status (diagnostic data) and demographic characteristics (such as age and gender) of an enrollee." CMS, Pub. No. 100-16, Medicare Managed Care Manual, ch. 7, § 70 (2014), https://www.cms.gov/Regulations-and-Guidance/Guidance/Manuals/downloads/mc86c07.pdf.

45.     "Beneficiary risk scores are used to adjust each plan's base payment rate for member health status, the first step in determining the per-person per month payment to MA organizations." CMS, Pub. No. 100-16, Medicare Managed Care Manual, ch. 8, § 50 (2014), https://www.cms.gov/Regulations-and-Guidance/Guidance/Manuals/Downloads/mc86c08.pdf.

46.     "CMS uses demographic and diagnostic information from original Medicare and from all MA organizations a beneficiary may have joined (taken from diagnostic data submitted by the organizations) to determine the appropriate risk score for each beneficiary. The risk score is computed for each beneficiary for a given year and applied prospectively. *The risk score generally follows the beneficiary for one calendar year*." *Id.* (emphasis added).

47.     Medicare Advantage organizations obtain diagnosis codes from healthcare providers after these providers have had medical visits with plan enrollees. *See* CMS, Pub. No. 100-16, Medicare Managed Care Manual, ch. 7, § 40 (2014), https://www.cms.gov/Regulations-and-Guidance/Guidance/Manuals/downloads/mc86c07.pdf. In turn, Medicare Advantage organizations report the diagnosis codes that they receive to the CMS for use in the risk adjustment model that is the key to calculation of capitation rates. *Id.*

48.     All diagnosis codes submitted must be documented in the medical record and must be documented as a result of a face-to-face visit. The diagnosis must be coded according to

- 11 -

International Classification of Diseases, (ICD) Clinical Modification Guidelines for Coding and Reporting. *Id.*

49.     For the diagnosis to be considered in the capitation calculation, the MAO must, "submit all required diagnosis codes for each beneficiary and submit unique diagnoses at least once during the risk adjustment data-reporting period. Submitters must filter diagnosis data to eliminate the submission of duplicate diagnosis clusters. . . If upon conducting an internal review of submitted diagnosis codes, the plan sponsor determines that any diagnosis codes that have been submitted do not meet risk adjustment submission requirements, the plan sponsor is responsible for deleting the submitted diagnosis codes as soon as possible." *Id.*

50.     Similarly, the plan must "receive and reconcile CMS Risk Adjustment Reports in a timely manner. Plan sponsors must track their submission and deletion of diagnosis codes on an ongoing basis." *Id.*

51.     "Once CMS calculates the final risk scores for a payment year, plan sponsors may request a recalculation of payment upon discovering the submission of inaccurate diagnosis codes that CMS used to calculate a final risk score for a previous payment year and that had an impact on the final payment. Plan sponsors must inform CMS immediately upon such a finding." *Id.*

52.     "CMS requires Medicare Advantage plans to collect hospital inpatient, hospital outpatient, and physician risk adjustment data and submit the data to CMS at least quarterly for calculation of the risk score for use in the payment calculation and payment reconciliation… Once plans have collected the data and verified the data came from an acceptable data source, the plans submit the data using the Risk Adjustment Processing System (RAPS) format and provide the five required data elements in the cluster." *Id.* At Section 120. The five required data elements include: the Health Insurance Claim Number (the beneficiary identification number),

the diagnosis code, the "service from date", the "service to date" (may be the same as the "service from date for outpatient and physician services), and the provider type (must be a hospital inpatient facility, hospital outpatient facility, or physician). *See* id.

53.     CMS requires that diagnostic data for the purposes of risk management reporting come from and appropriate source – specifically a hospital inpatient facility, hospital outpatient facility, or a physician. *Id.* At Section 120.1.1. "Diagnostic radiologists typically do not document confirmed diagnoses. The diagnosis confirmation comes from referring physicians or physician extenders and is, therefore, not assigned in the medical record documentation from diagnostic radiology services alone." *Id.*

54.     "The collection of physician data relevant for risk adjustment is *associated with the physician's specialty*." *Id.* (emphasis added). "Qualified physician data for risk adjustment requires a face-to-face visit with the exception of pathology services (professional component only). Only those physician specialties and other clinical specialists identified [by CMS] are acceptable for risk adjustment." *Id.* (*See* Table 19. Acceptable Physician Specialty Types Payment Year 2011 (dates of service 2010 at p. 46 for list of physician specialties and other clinical specialists deemed appropriate to identify data for risk adjustment purposes.).

## VIII.   Chronic Condition Management (CCM)

55.     In 2015, Medicare changed its rules to focus on preventative care, especially regarding patients who suffer from chronic health conditions.

56.     The latest change or rules related to chronic care management can be found in the Federal Register, from a proposed, and accepted rules change in November 2016. *Reducing Administrative Burden and Improving Payment Accuracy for Chronic Care Management (CCM) Services* 81 FR 80243.

57.     The proposed rule changes provide further information regarding the rationale for these changes. "Beginning in CY 2015, [CMS] implemented separate payment for CCM services under CPT code 99490 (Chronic care management services, at least 20 minutes of clinical staff time directed by a physician or other qualified health professional, per calendar month) . . . ." 81 FR 80243.

58.     The purpose of this change was "to improve payment for, and encourage long-term investment in, care management services." 81 FR 80243 (*citing* 79 FR 67715).

59.     The changes in the rules reflected the regulators' desire to make sure physicians and facilities had "the resources required to furnish complex chronic care management services to beneficiaries with multiple (that is, two or more) chronic conditions were not adequately reflected in the existing E/M codes." 81 FR 80243.

60.     In addition to making sure physicians had the time, resources, and compensation to fully manage their patients' chronic conditions, the regulators were also concerned with making sure physicians were sufficiently *capable of furnishing such services*.

61.     "In finalizing separate payment for CPT code 99490, [CMS] considered whether [CMS] should develop standards to ensure that physicians and other practitioners billing the service would have the capability to fully furnish the service." 81 FR 80243 (*citing* 79 FR 67721).

62.     "[CMS] established requirements to furnish a preceding qualifying visit, obtain advance written beneficiary consent, use certified electronic health record (EHR) technology to furnish certain elements of the service, share the care plan and clinical summaries electronically, document specified activities, and other items. . . ." 81 FR 80243.

63.     A common complaint listed among stakeholders was that the chronic care management CPT code was usually exceeded without additional benefit, disincentivizing care

- 14 -

longer of 20 minutes, which led to the revision/creation of CPT code 99487, meant specifically

for "complex" cases, where there would be higher reimbursement for 60 minutes of time spent

with patients. *See* 81 FR 80244.

64.     There are two categories chronic conditions that Medicare focuses on: complex

and non-complex.

65.     The criteria for billing for monitoring and management of "non-complex" chronic

conditions (CPT Code 99490) are:

        a.  a doctor/physician assistant/nurse practitioner must spend at least 20 minutes
with the patient per month,

        b.  the patient must have multiple chronic conditions expected to last at least 12
months,

        c.  the chronic condition must place the patient at significant risk of death,
decompensation, or functional decline, and

        d.  a comprehensive care plan must be established, implemented and monitored
by the care giver.

66.     If the criteria for non-complex patients' chronic care management plans are met,

providers would receive a reimbursement of approximately $43.00 per patient per month on a

fee-for-service plan (FFS).

67.     The criteria for billing for monitoring "complex" chronic conditions (CPT Code

99487) are the following:

        a.  patients must have multiple chronic conditions expected to last at least 12
months (or until death),

        b.  the chronic conditions place the patient at significant risk of death or
functional decline,

- 15 -

c. the medical providers establish a comprehensive care plan,

d. there must be moderate or high complexity in medical decision making, and

e. a doctor/physician assistant/nurse practitioner must spend at least 60 minutes with the patient per month.

68.    Physicians should be providing an in-depth analysis of patient conditions to determine if the conditions are being controlled; a physician can't simply ask if the patient is on medication or if they have experienced mood swings but needs to provide a more thorough service to bill for the complex chronic care management.

69.    If the criteria for complex patients' chronic care management plans are met, providers would receive a reimbursement of approximately $94.00 per patient per month on a Fee-for-service (FFS) plan.

70.    Several conditions qualify as chronic conditions. These include:

a. Alzheimer's Disease and Related Dementia

b. Arthritis (Osteoarthritis and Rheumatoid)

c. Asthma

d. Atrial Fibrillation

e. Autism Spectrum Disorders

f. Cancer (Breast, Colorectal, Lung, and Prostate)

g. Chronic Kidney Disease

h. Chronic Obstructive Pulmonary Disease

i. Depression

j. Diabetes

k. Heart Failure

l. Hepatitis (Chronic Viral B & C)

m.  HIV/AIDS

n.  Hyperlipidemia (High cholesterol)

o.  Hypertension (High blood pressure)

p.  Ischemic Heart Disease

q.  Osteoporosis

r.  Schizophrenia and Other Psychotic Disorders

s.  Stroke

71.     MAOs offered under Medicare Part C cover all Part A and Part B services. Since CCM is a current Part B benefit, all Medicare Advantage plans have CCM as a covered benefit for their enrolled members. *See* National Council on Aging, *Chronic Care Management Information Resource* 11 (March 2018), https://www.ncoa.org/wp-content/uploads/CCM-Information-Resource_FINAL_031218.pdf.

72.     The CCM program developed by CMS and billed by providers under CPT Codes 99490 and 99487 apply only to Medicare Part B Fee for Service plans, not to Medicare Part C plans. However, because Part C plans must encompass all the services provided under Parts A and B, a discussion of CCM in the Fee for Service context is necessary to provide the baseline of CCM services that must be provided by Part C plans. Additionally, the fact that CCM services are reimbursed as additional services demonstrates that the provision of CCM services is material to CMS payment decisions.

73.     The regulations governing chronic condition management and the costs of such care are factored into the capitation rates given to Defendants by CMS both because CCM is a service offered under Part B, and because existence of additional chronic conditions increases the Part C plan's risk adjustment score leading to increased capitation rates.

74.     In sum, CCM is meant to be an in-depth review and plan for managing difficult, often complex, conditions that usually require the skills of a specialist, or that of an experienced general physician and to appropriately compensate providers for the extra time and effort required to manage these chronic conditions.

75.     "CCM was designed for *primary care practitioners* who comprehensively manage all of a patient's care. For example, it includes a comprehensive care plan addressing all health issues and ensuring receipt of preventive services. However, any practitioner who meets the CCM requirements can bill CCM . . . ." CMS, *Frequently Asked Questions about Physician Billing for Chronic Care Management Services* 6 (January 1, 2019), https://www.cms.gov/Medicare/Medicare-Fee-for-Service-Payment/PhysicianFeeSched/Downloads/Payment_for_CCM_Services_FAQ.pdf (emphasis added).

76.     Relator Bicocca, before Permanente's scheme began, would rarely engage in CCM as a part of his Paint Management specialty.

77.     Relator's knowledge of medical practice in general suggests that most specialists also spend little time on CCM unless that chronic condition is directly applicable to that specialist's practice.

78.     Relator's knowledge of medical practice in general suggests that, aside from specialists engaging in CCM related to their practices, most CCM comes into play with experienced generalists who have elderly patients with multiple chronic conditions.

**IX. The False Claims Act and California False Claims Act**

79.     The FCA, 31 U.S.C. §§ 3729–3733 was enacted in 1863 by Congress and provides that any person who knowingly submitted false claims to the government was liable for damages plus a penalty for each claim. The FCA has been amended several times.

- 18 -

80.     The FCA imposes liability on any person or entity who knowingly presents or causes to be presented a false or fraudulent claim for payment or approval. 31 U.S.C. § 3729(a)(1)(A). Additionally, those who make, use or cause to be made a false statement or record material to the claim are also liable under the FCA. 31 U.S.C. § 3729(a)(1)(B).

81.     The terms "knowing" and "knowingly" are defined by the statute as a "person" having actual knowledge of the information, acting in deliberate ignorance of the truth or falsity of the information, or acting in reckless disregard of the truth or falsity of the information. 31 U.S.C. § 3729(a)(3)(B)(4).

82.     The term "material" means having a natural tendency to influence, or be capable of influencing, the payment or receipt of money or property. 31 U.S.C. § 3729(a)(3)(B)(4).

83.     "A claim under the False Claims Act requires a showing of (1) a false statement or fraudulent course of conduct, (2) made with the scienter, (3) that was material, causing (4) the government to pay out money or forfeit moneys due." *United States ex rel. Campie v. Gilead Scis., Inc.*, 862 F.3d 890, 899 (9th Cir. 2017), *cert. denied sub nom. Gilead Scis., Inc. v. U.S. ex rel. Campie*, 139 S. Ct. 783, 202 L. Ed. 2d 566 (2019).

84.     Any person who violates the FCA is liable for damages in the amount of three (3) times the amount of loss the government sustained and penalties which range between $10,957 and $21,916 per claim. 31 U.S.C. § 3729(a); 28 C.F.R. § 85.3.

85.     The California False Claims Act also imposes liability on any person or entity who knowingly presents or causes to be presented a false or fraudulent claim for payment or approval to the State of California. Cal. Gov't Code § 12651 *et seq*.

86.     "[Fraud against] [t]he Medicare Advantage capitation payment system is subject to the False Claims Act." *WellPoint, Inc.*, 904 F.3d at 673.

## X. Factual Overview

87.     The Kaiser defendants, who contracts with CMS, to insure Medicare beneficiaries through the Medicare Advantage program, and the State of California to provide insurance to CalPERS beneficiaries improperly increases its capitation rate through identifying and adding as many diagnosis as possible to increase the risk adjustment data submitted to CMS which in turn increases the capitation rate Kaiser receives for provide care to Medicare beneficiaries.

88.     The Permanente defendants work hand in glove with the Kaiser defendants to perpetuate this overbilling by training all Permanente physicians to indicate that Medicare and CalPERS patients have chronic conditions and record that the chronic conditions were discussed with the patient so that it appears that the diagnosis, re-affirmation of the diagnosis, and chronic condition management was appropriately provided by the physician. Permanente reinforces this training by tracking compliance metrics and offering "retraining" to physicians whose certification numbers fall too low.

89.     Bicocca raised concerns to the trainers and Permanente management that what he and his fellow physicians were being instructed to do was not truthful and amounted to fraud. In response, Bicocca and his team were given sufficient leeway to alter the language in the charts to be truthful to the services Bicocca felt were performed, but this exception was not communicated to other Permanente physicians resulting in the vast majority of Permanente physicians blindly indicating the existence of chronic conditions and management of the same.

**a.  Permanente trains its physicians to indicate that Medicare and CalPERS patients have chronic conditions and chart that the conditions were confirmed and discussed.**

90.     In or around 2015, Permanente changed how it directed its physicians to "manage" chronic conditions through a series of trainings on billing, note writing, and coding.

- 20 -

91.     Permanente claimed that this change was to increase patient care. However, that statemen was quickly belied by the fact that the change in how physicians were required to manage chronic conditions was only required for Medicare and CalPERS patients, not all patients.

92.     The trainings and policy changes directed by Permanente management were meant specifically to affect only Medicare and other public benefits patients, creating a two-tiered system of chronic care management, where private health insurance patients are given the usual chronic care management, if any, and where physicians are required to check off all chronic conditions that could conceivably apply to a Medicare of CalPERS patient and place a certifying statement in the patient's record that the condition was discussed and managed, without adequate *management* of those chronic conditions as required by federal regulations and CMS. Again, this mandate was only required for patients with public benefits, not all patients seen by Permanente physicians.

93.     Over time, Defendants' method of directing physicians to perform this fraud grew more subtle as Bicocca continually objected to the trainings.

94.     In or around 2015, along with rolling out new training on chronic conditions, Permanente started providing physicians with MDP reports. These reports were printed in hard copy for each Medicare or CalPERS patient the doctor had scheduled that day and the report listed the patient's chronic conditions that Permanente wanted the doctor to check off in the EMR. An electronic version of the MDP Report existed in the EMR and was called an App1.

95.     In addition to the printed MDP reports, the EMR had "pushpins" that listed the patient's chronic conditions separate from their other problems and conditions. These pushpins were set apart to draw attention to the chronic conditions so that the doctor would check the box next to these chronic conditions in the EMR.

96.     Finally, in 2015, Permanente added a new column to the doctors' schedules in the EMR – an MDP column. This column indicated who in the doctor's daily schedule was a Medicare or CalPERS beneficiary who had outstanding chronic conditions to be check off.

97.     If a doctor saw a patient with an MDP report, but did not check off on all of the chronic conditions listed on the MDP report and in the EMR, the doctor would get a follow up email, automatically generated by the system, asking the doctor if they had confirmed and addressed those diagnoses and forgot to chart that in the EMR. The email then told the doctor that they still had time to check off the chronic conditions and add a chart note explaining the delay.

98.     In addition to clicking the boxes in the EMR for the patient's chronic conditions, the physicians were also instructed to include language in the patient's chart for the visit that indicated that the condition's diagnosis was confirmed, considered in the doctor's care, that the condition was discussed, and that the condition is stable.

99.     Senior leadership at Permanente, including Jason Guardino, the Assistant Physician in Charge (APIC) and Chief of Gastroenterology Department, provide the language for the certifying statements.

100.    Senior leadership at Permanente, through emails and training initiatives, directed physicians to insert the following in their charts:

> I have confirmed the presence of the above clinical diagnoses, which were considered in the current and ongoing care of the patient.  At the time of the visit, the medical record indicates, and/or the patient states, that there are no changes in these conditions unless otherwise noted. As treatment warrants, the patient has been advised to follow up with her PCP or appropriate specialist.

101.    This statement suggests that some, but not all of the steps of management of a patient's chronic conditions are satisfied: (1) the physician confirms that the patient has

qualifying chronic conditions, and (2) the physician considers these chronic conditions when making medical decisions about that patient.

102.    The statement also notes that, if there are no additional notes, then there were no changes in the patient's chronic conditions, while also noting that the patient was advised to speak to their specialist physicians regarding those specialist conditions if necessary.

103.    This is problematic, however, as the regulations show that management of a patient's condition typically means *acting as that specialist*, not simply referring the issue away.

104.    For example, below is an email from Permanente confirming the language of the certification, dated August 11, 2015. The email includes a statement by Serene Tran, a trainer for Permanente.

Serene N Tran          "I have confirmed the presence of the above clini...          08/11/2015 01:24:31 PM

From:        Serene N Tran/CA/KAIPERM
To:          Jeremy Lawrence/CA/KAIPERM@KAIPERM
Cc:          Jason M Guardino/CA/KAIPERM@Kaiperm, Keshia Y Redmond/CA/KAIPERM@Kaiperm, Michael
             J Bicocca/CA/KAIPERM@Kaiperm
Date:        08/11/2015 01:24 PM
Subject:     Re: .refresh - clarification needed

"I have confirmed the presence of the above clinical diagnoses, which were considered in the current and ongoing care of the patient. At the time of this visit, the medical record indicates, and/or the patient states, that there are no changes in these

conditions unless otherwise noted. As treatment warrants, the patient has been advised to follow up with her PCP or appropriate specialist. "

Above is the revised version of the .FOL which is included in our .REFRESH smartphrase.

What I take from this is that as long as you review the chart (problem list, medication list, and/or labs) when you see the patient, you can confirm that the patient has the diagnosis and the decision you make will be influenced (explicitly or implicitly) by the patient's medical history.
Also, the revised version included the phrase "as treatment warrants" to imply that if there is no change of treatment needed, you do not need to advise the patient to follow up with pcp or specialist.

I hope this helps.

Serene

**NOTICE TO RECIPIENT:** If you are not the intended recipient of this e-mail, you are prohibited from sharing, copying, or otherwise using or disclosing its contents. If you have received this e-mail in error, please notify the sender immediately by reply e-mail and permanently delete this e-mail and any attachments without reading, forwarding or saving them. Thank you.

- 23 -

105.    This statement is widely distributed to physicians at Permanente. Insertion of the statement in appointment notes is made easy using something called a "dot phrase," which only requires typing a quick shortcut to have the entire statement appear on the patient's records. The statement, as can be seen below, can be efficiently input by just typing the dot phrase ".FOL" into the electronic database.



106.    Interestingly, the above list contains more than the original statement. Also included are addenda phrases meant to modify the list of diagnoses confirmed after the fact. While it is reasonable that physicians may accidentally over or under include diagnoses after an

appointment, Bicocca states that one purpose of these additional dot phrases was to allow for physicians not meeting their criteria to increase their "success rate."[2]  These codes do not just add language to remedy an existing diagnosis where the provider failed to enter a timely .FOL statement indicating that the chronic condition was adequately managed, these additional codes also encourage providers to add additional diagnoses to the chronic condition list that were not previously present in the patient chart.

107.    Permanente requires physicians, in addition to adding the .FOL statement, to go through the a list of chronic conditions with every public benefits patient, check up on the status of those diagnoses, and confirm them, regardless of whether physicians have the time or qualifications to do so. It is difficult for physicians to do this, and Bicocca believes that many of the Permanente physicians are not doing this for each of the chronic conditions their patients have.

108.    Two sources exist for the diagnoses that physicians are required to add onto Medicare and CalPERS patient records through this process.

109.    The first source are diagnoses that these patients had already, confirmed in previous years by other physicians. While, as a matter of first impression, this does not seem to be a violation of regulations, since the patients have already had the diagnoses confirmed by others, having physicians re-confirm these diagnoses without spending sufficient time on it and without having any expertise on these diagnoses is still a violation of Medicare's regulations on confirming diagnoses for the purpose of risk adjustment.

110.    The second source of diagnoses that physicians were required to pretend to address were diagnosis items were generated, through data mining, by a computer search of patient records looking for key words that had been entered but never followed up on or

---

[2] As will be seen in a later section, Permanente tracked physicians' compliance with the new trainings and established quotas of diagnoses called the "success rate."

confirmed as a true diagnosis. These diagnoses, about 10% of the total diagnoses to be added, were added on to patient records without any previous confirmation by qualified physicians, meaning they could have been inaccurate.

111.    The data-mined diagnoses would show up under patient names on the "MDP sheets" that physicians received every day in which patients who needed diagnoses coded had appointments. Physicians were required to review these records to add more coding when necessary.

112.    Bicocca provides the following by way of example:

a.   Aortic atherosclerosis might be in the report of a chest X-ray from a visit unrelated to the visit with Bicocca. Bicocca would be required to enter the Aortic atherosclerosis diagnosis during his appointment. This is because CMS specifically does not allow diagnoses for the purposes of risk adjustment data to be added based on radiological testing alone, it must be confirmed and added by a physician.

b.   "Asthma" might have appeared in an emergency room note, but not entered on the patient's problem list. Bicocca would then be required to determine if that patient did indeed have this condition (something a specialist like Bicocca did not have the qualifications to do, since it falls outside of his specialty). Bicocca was supposed to enter the diagnosis on their problem list and code for it.

c.   If a patient comes to see Bicocca for a facet injection, but also has diabetes, high blood pressure, a history of cancer, depression, or high cholesterol, then the foregoing policy would obligate Bicocca and other physicians to confirm all of the above conditions are still present, certify that the patient's conditions

are stable, and recommend the patient follow-up as necessary with their primary care physician or specialist. Bicocca, a pain management physician, is not trained and does not have the expertise or ability to manage the patient's cancer or depression. Nor are some of the above conditions relevant to Bicocca's medical decision making regarding the patient's pain management issues. However, he would still be obligated to record, using a .FOL statement, that he confirmed the diagnosis of these conditions and discussed the management of the conditions with the patient.

113.    Permanente physicians may not have the expertise to diagnose, confirm, or address the chronic conditions Permanente is pressuring them to address. This is problematic for patient care and also because CMS guidance states, "the collection of physician data relevant for risk adjustment is *associated with the physician's specialty*." CMS, Pub. No. 100-16, Medicare Managed Care Manual, ch. 7, § 120.1.1 (2014), https://www.cms.gov/Regulations-and-Guidance/Guidance/Manuals/downloads/mc86c07.pdf

114.    Bicocca and other physicians do not typically have appointments which last long enough to discuss each of these conditions in full detail and to, in good faith, write the Permanente-supplied certification in the chart.

115.    Below is a quick overview of Bicocca's typical appointments, which begin at 7:30 AM every weekday.

> a.    As of Fall 2018, forty-five-minute consultations for new patients, with limited discussion of non-pain-related conditions insofar as they would impact any pain management procedures.
>
> b.    Before Fall 2018, initial consults were only thirty minutes, giving physicians less time for comprehensive chronic condition care.

c. Thirty-minute procedure appointments, including facet injections. There is little discussion of any non-pain-related conditions unless any would affect the immediate procedure. During this appointment, Dr. Bicocca is performing a medical procedure.

d. Thirty-minutes follow-up discussion appointments on the effectiveness of the procedure and whether any anything else is needed, including a limited discussion of other conditions for their effect on the recovery.

116.    None of the appointments provide Bicocca and other physicians in his practice the time or opportunity to evaluate, diagnose, or manage any chronic conditions a patient may have. Dr. Bicocca has reason to believe that other specialty physicians at Permanente conduct their appointments in a similar manner and would also not have the time in any given appointment necessary to discuss, evaluate, or manage a patient's chronic conditions.

117.    Based on Relator's experience, patients typically spend 17 to 20 minutes with their pain management physicians during a procedure appointment, 25 minutes in a return appointment, 25 minutes during initial consultations, and 40 minutes during initial consultations that occurred after Fall 2018, with five minutes of documentation time, none of which is enough time to describe, discuss, and cover the nearly two dozen chronic conditions listed above. Relator estimates that his own practice has longer appointments than the norm for specialists, which he believes are typically around 20 minutes each.

118.    Worse, even if they were given the time they needed, in theory, Bicocca and other specialist physicians do not have the expertise to fully advise their patients on the various ailments that are listed above.

119.    Each of these conditions in themselves require years of study and training in order to conduct a proper consultation or follow up appointment.

120.    For example, a pain management specialist does not have the neurological and psychological training or credentials to conduct a full review of a patient's Alzheimer's or schizophrenia. A pain management specialist could not effectively review or manage a patient with heart failure, atrial fibrillation, ischemic heart disease, hyperlipidemia, and hypertension the way that a cardiologist could. Typically, only a primary care physician or pulmonologist could diagnose or manage asthma or chronic obstructive pulmonary.

121.    In fact, the only condition initially Bicocca felt even nominally comfortable discussing with patients is diabetes, even though he is not an endocrinologist. Dr. Bicocca would discuss a patient's diabetes but only to the extent that such a condition would affect the patient's pain management procedure, not a full evaluation with moderate or high complexity in medical decision-making as is required by the chronic condition management.

122.    Upon reading Medicare's requirements, Bicocca realized that he was not qualified to even discuss diabetes by CMS's standards, and that he only felt comfortable with the topic under the false training provided by Defendants.

123.    In fact, very few specialists could cover more than just a few of the chronic conditions listed above, and none of the other pain management physicians in Bicocca's office could do so.

124.    Bicocca and his fellow physicians are instructed to certify something they have neither the expertise nor time to certify that every patient who comes into the South Sacramento Medical Center is given a comprehensive assessment of all their chronic conditions, all to Permanente's benefit.

125.    The result of this essential impossibility for being able to check off chronic conditions at every appointment with Medicare and public benefits patients at Permanente is that every physician is either misled into or forced into falsely confirming diagnoses, and creating a

record in the patient note that the diagnosis was confirmed and discussed. These false statements are all for the purposes of increased reimbursement to Defendants as evidenced by the fact that they are only required for Medicare and CalPERS patients.

126.    In addition, the training in fraudulent documentation Relator and his fellow physicians received is also occurring at Southern California Permanente and could exist at other Permanente groups, suggesting a common source from the Permanente Federation.

**b. Defendants track physicians to ensure compliance with its fraud scheme.**

127.    Defendants have created an internal regulatory system and data-collection apparatus with the sole purpose of tracking whether its physicians are complying with the foregoing requirements.

128.    This includes gathering data on the success rate of each physician, the percentage of diagnoses the physician had been assigned that were actually confirmed through checking the MDP box and using the dot phrases.

129.    When Bicocca voiced his concerns to the training instructors regarding potential fraud, the trainer's response was that including the statement was not mandatory and should not be included where the physician is not "comfortable" doing so.

130.    However, the trainers and even Permanente management would immediately follow up with the expectation that Bicocca be "comfortable" with 90% of diagnoses and therefore include the statement for at least 90% of the diagnoses he was assigned.

131.    The assurance that checking off all chronic conditions and using the. FOL phrase was not mandatory was almost never provided to the physicians during the training, leading most physician to believe that including the statements provided was mandatory.

132.    Bicocca, and every physician working with Bicocca, understood that this 90% benchmark is not only a suggestion, but a requirement to be more likely to obtain bonuses,

promotions, and other benefits, and a metric by which entire offices, departments, and careers, are judged.

133. Crucially, a dataset that Bicocca obtained from Permanente listing doctors and their success rates shows that most physicians have scores that meet the 90% requirement, suggesting that Permanente's instructions led to physicians including this language with nearly every single Medicare and CalPERS patient.

134. Defendants do this by turning chronic condition management into a performance metric in all but name for all physicians: while never explicitly stated, Bicocca and his coworkers understood that a good "success rate" – i.e. providing to Defendants as many diagnoses as possible and certifying chronic care management – was a means to increased salary, bonuses, and potentially other benefits, such as promotion.

135. A weekly email send to Bicocca and others with success rate information contains a disclaimer that reads "Reminder -The Chiefs Weekly Efficiency Dashboard and individual clinician efficiency information is intended for Chiefs, PM's and Documentation & Coding Consultants to help them id Departments and Clinicians who may need additional operational support to fully and accurately document diagnosed conditions for the risk adjusted population. It is not intended to be used as a target metric that any individual clinician must achieve."



136.    However, individual clinicians are being rated along this metric. An implicit

understanding exists between clinicians and their managers that these metrics are one of several

that impact performance scores, and therefore impact bonuses and other opportunities.



137.    Documents such as the above are sent out weekly, with updated numbers to

encourage further compliance among physicians. The dataset contains 1,000 physicians that have

a 100% success rate. A 100% success rate would be difficult to achieve were it not for

Defendants' intentional oversimplification of what was necessary to diagnose, confirm, and

manage the chronic conditions.

138.    Defendants made clear that the "success rate" was as much a part of a physician's

record as any official performance metric. Bicocca himself once got an email from a compliance

- 32 -

officer at Permanente stating that his success rate was too low and suggested additional training. Bicocca declined additional training, as he was near retirement and did not fear any potential repercussions. He did not face immediate consequences but believes that he would likely have suffered long-term consequences had he stayed at Permanente.

139.   This pressure to comply with Defendants' chronic condition certification and management system is nearly all-encompassing, as one third of Permanente patients are Medicare patients, and one in ten of Permanente's patients are CalPERS patients.

### c.   Defendants dot phrases are false statements in support of false claims for increased capitated rates.

140.   Defendants require use of the dot phrases to make it appear as if the Permanente physicians have done more than simply tick off a check box with it comes to diagnosing and managing chronic conditions.

141.   The language coded in the dot phrases are placed into the patient's EMR and indicate that the physician performed much more work that Bicocca alleges most physicians do when it comes to a patient's chronic conditions.

142.   Additionally, as evidenced by Bicocca's email communications with management, the dot phrases do not accurately reflect the work the physicians are doing or the work that management expects them to do. As such, these statements are false.

143.   These false dot phrase statements support an appearance of properly diagnosing, confirming the diagnosis, and discussing the chronic conditions in support of continued, increased capitation rates.

144.   Relator also recalls discussions of these dot phrases and their purposes being related to financial incentives during trainings on the chronic condition management requirements. The trainers that Bicocca recalls arriving in 2015 told physicians that inputting these diagnoses codes are vital to their paychecks, i.e. Permanente could not hire, provide raises

- 33 -

and promotions, and could not buy any new equipment. Bicocca was also instructed that each of the chronic conditions for Medicare and CalPERS patients had to be checked off (essentially confirming the continued existence of the diagnosis) every year for Defendants to be paid for that patient.

145.    What these 2015 and onward trainings conveyed was that filling these diagnoses out, and checking that they had been reviewed in subsequent visits, is the how Permanente gets paid, and that certain patients have more funds as a part of their public insurance plans, and that the .FOL statement leads to higher reimbursement.

### d.  Bicocca Raises Concerns About Permanente's Unlawful Practices

146.    Over the course of multiple mass emails and several regular trainings, Bicocca and other physicians received instruction to include every problem that qualifies as chronic for a patient in that patient's chart after the appointment.

147.    In or around 2015, Guardino gave the first mandatory educational meeting at South Sacramento Medical Center. His original statement, mirrored by the PowerPoint presentation he showed the audience, was something to the effect of "for this new billing process, you must check and discuss every chronic condition, and then you're done."

148.    The implication here is that any mention of a condition by the physician or patient, even inquiring if the patient has the condition, warranted certification that the chronic conditions were present and being managed.

149.    In or around 2015, another trainer stated that if a patient states in response to a question that he or she is taking medication for a certain condition, this would satisfy that the condition was present and being managed. This is in direct contradiction to the foregoing guidelines and Bicocca's opinion of what it requires for a medical professional to diagnose, confirm the diagnosis, or manage a condition.

150.    Relator immediately reached out to the training staff after the session was complete to note that the training materials could not possibly be accurate, as they imply that Permanente is asking physicians to diagnose and "manage" conditions that they have no time nor expertise to diagnose or manage.

151.    Over time, the training staff responded, only to Bicocca, that he was only to manage chronic conditions he was "comfortable with," such as diabetes. This seemed to be a softening of their position, until they stated that he was required to be "comfortable with" 95% of the conditions listed above. The clarification in Permanente's requirement for physicians was only given to Bicocca after he pushed back, it was not distributed to all physicians who previously received training to check off the condition and use the .FOL statement if the patient so much as mentioned they were on medication for a chronic condition.

152.    Worse, Defendants, through training staff and regular check in meetings, implied that physicians would be disciplined or otherwise adversely acted upon if they did not meet this threshold. Examples of this were a reduction of bonus.

153.    After the first training, in which physicians were told by the training staff from Permanente that they needed to check nearly every box showing stability in the patient's chronic condition, Permanente sent non-physician trainers to every department to ensure that this directive was being followed.

154.    At one point, the trainers specifically told Bicocca that a patient who was taking an antidepressant qualified to be marked as "stable" under the chronic condition of depression. Relator told the trainers that taking an antidepressant is in no way proof that a patient is stable in that area, and that he could not determine such a thing, since he is not a psychiatrist or a primary care physician.

155.    Every week, the administrative chiefs of every department received emails detailing which doctors were not checking at least 90% of the listed chronic conditions with every patient.

156.    In meetings between department chiefs, the group would discuss which departments were most successful in meeting this criterion.

157.    At one point in time, the highest achieving department in South Sacramento was Orthopedic Surgery, where most of the physicians would not have the clinical expertise to diagnose, confirm, or manage these conditions to the extent required by CMS.

158.    As the Chief of Pain Management at the time, other physicians under Bicocca's supervision brought concerns to Bicocca about the practice.

159.    On August 11, 2015, shortly after another meeting in which Bicocca was given suspect training on what was required or chronic conditions, Bicocca called Manager of Financial Services Jeremy Lawrence to express his concerns about the chronic condition language mandate Defendants were requiring.

160.    Lawrence immediately forwarded these concerns to Serene Tran, Guardino, and Keshia Redmond, stating: "Dr. Bicocca indicated that he was told during the meeting today that .FOL had changed to indicate more of a 'yes, I confirm these conditions are still listed in Healthconnect' type of statement. *He is concerned about fraud* since it's unlikely that he (or most other specialists) won't actually ask about or address conditions outside of what they are treating the patient for." (emphasis added).

1

2

3

4

Jeremy Lawrence        Hello Serene & Keshia - I just received a call fro...        08/11/2015 01:09:12 PM

From:        Jeremy Lawrence/CA/KAIPERM
To:          Serene N Tran/CA/KAIPERM@Kaiperm, Keshia Y Redmond/CA/KAIPERM@KAIPERM
Cc:          Michael J Bicocca/CA/KAIPERM@Kaiperm, Jason M Guardino/CA/KAIPERM@KAIPERM
Date:        08/11/2015 01:09 PM
Subject:     .refresh - clarification needed

5

Hello Serene & Keshia -

6

I just received a call from Dr. Bicocca in Pain Management seeking clarification on the use of .REFRESH, specifically around the language provided by .FOL.

7

8

.FOL seems to be a bit too specific in his opinion by implying that the physician actually confirmed the presence of the condition by way of conversation with the patient or by review of the medical record.  Dr. Bicocca indicated that he was told during the meeting today that .FOL had changed to indicate more of a "yes, I confirm these conditions are still listed in Healthconnect" type of statement.

9

10

11

12

13

14

15

16

He is concerned about fraud since it's unlikely that he (or most other specialists) won't actually ask about or address conditions outside of what they are treating the patient for.  Can you please offer clarification on this?  thank you

17

Jeremy Lawrence, MBA
Manager, Medical Office Financial Services
TPMG Controller's Office, South Sacramento Medical Center
Mobile - (916) 956-9815 / Work - (916) 525-3028 tie 8-415 / Fax - (916) 525-3091 tie 8-415

18

19

**NOTICE TO RECIPIENT:** If you are not the intended recipient of this e-mail, you are prohibited from sharing, copying, or otherwise using or disclosing its contents.  If you have received this e-mail in error, please notify the sender immediately by reply e-mail and permanently delete this e-mail and any attachments without reading, forwarding or saving them.  Thank you.

20

21    161.    Guardino responded on the same day, stating that simply asking if the patient has

22    a condition is enough to mark the condition as having been managed.

23

24

25

26

27

28

- 37 -

1

2

{In Archive} Re: .refresh - clarification needed

Jason M Guardino   to: Jeremy Lawrence                              08/11/2015 01:16 PM
Cc:  Keshia Y Redmond, Michael J Bicocca, Serene N Tran

3

4

Each physician should ask about these... It's simply 'you have athlerosclerosis correct Mr. Smith'.
If they don't know, and it's on a CT, then its fine...  (in this example).

5

6

Also... a key point.  Lets say a person has hx of breast cancer and has nothing to do with a pain block in
the leg whatsoever.
The fact that you thought about it has nothing to do with this pain block, is a way of acknowledging it as
well.
In other words, you thought about how it has no bearing on this procedure.
Just as if you would think about something having a bearing on doing the procedure.
i.e. both pertinent positives and negatives.

7

8

Hope that makes sense.

9

Also, FOL is a regional phrase passed by many lawyers and others in region.

10

Thanks.

11

162.     Tran's answer repeated that simply asking about and reviewing the diagnosis

12

would be enough, if one's medical judgment was "implicitly" influenced by the diagnosis.

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

- 38 -

Serene N Tran/CA/KAIPERM          "I have confirmed the presence of the above clini...          08/11/2015 01:24:31 PM

From:       Serene N Tran/CA/KAIPERM
To:         Jeremy Lawrence/CA/KAIPERM@KAIPERM
Cc:         Jason M Guardino/CA/KAIPERM@Kaiperm, Keshia Y Redmond/CA/KAIPERM@Kaiperm, Michael
            J Bicocca/CA/KAIPERM@Kaiperm
Date:       08/11/2015 01:24 PM
Subject:    Re: .refresh - clarification needed

"I have confirmed the presence of the above clinical diagnoses, which were considered
in the current and ongoing care of the patient. At the time of this visit, the medical
record indicates, and/or the patient states, that there are no changes in these

conditions unless otherwise noted. As treatment warrants, the patient has been advised
to follow up with her PCP or appropriate specialist. "

Above is the revised version of the .FOL which is included in our .REFRESH smartphrase.

What I take from this is that as long as you review the chart (problem list, medication list, and/or labs)
when you see the patient, you can confirm that the patient has the diagnosis and the decision you make
will be influenced (explicitly or implicitly) by the patient's medical history.
Also, the revised version included the phrase "as treatment warrants" to imply that if there is no change of
treatment needed, you do not need to advise the patient to follow up with pcp or specialist.

I hope this helps.

Serene

**NOTICE TO RECIPIENT:** If you are not the intended recipient of this e-mail, you are prohibited from sharing, copying, or otherwise
using or disclosing its contents. If you have received this e-mail in error, please notify the sender immediately by reply e-mail and
permanently delete this e-mail and any attachments without reading, forwarding or saving them. Thank you.

163.     Bicocca responded to these emails on August 13, 2015, by pointing out the lack of

consistency between Guardino and Tran, along with the lack of consistency between what was

discussed via email, and what had been discussed earlier during trainings, when the requirements

were implied to be even looser.

164.     Bicocca then asked "[w]hy are we promoting the use of a phrase we know is

making our medical documentation incorrect. I think that is fraud."

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23

From:         Michael J Bicocca/CA/KAIPERM
To:           Serene N Tran/CA/KAIPERM@Kaiperm
Cc:           Jeremy Lawrence/CA/KAIPERM@KAIPERM, Jason M Guardino/CA/KAIPERM@KAIPERM,
              Keshia Y Redmond/CA/KAIPERM@KAIPERM
Date:         08/13/2015 05:49 PM
Subject:      Re: .refresh - clarification needed

I hate to be a thorn but it does not help.  All my MDs feel the same as I do about this.

I can see that reading the problem list is considering the diagnosis, but the rest of the statement is not true
based on the work flow we discussed the other day.

At the time of this visit, the medical record indicates, and/or the patient states, that there
are no changes in these conditions unless otherwise noted.

        That statement says I either reviewed the chart or discussed with the patient to determine that
these conditions have "no changes".  I am not doing that when "I consider breast cancer" before doing an
injection. Nor am I doing that when I review their medications or read the problem list.  I'll hypothesize that
no one besides a PCP is doing that.

As treatment warrants, the patient has been advised to follow up with her PCP or
appropriate specialist
        For this to be true I would have to tell every patient to follow up with their PCP or specialist at
every appointment I use this phrase.  Jason are you saying that to patients?

Jason do you really ask every patient if they have every problem on the problem list?

I just can't imagine that MDs are doing all the things that would be required to make this a true statement.
Let's be realistic. I doubt the attorneys said this was OK if the MDs aren't doing it.  Why are we promoting
the use of a phrase we know is making our medical documentation incorrect.  I think that is fraud.

Serene, asking the patient if they have every problem on the problem list, telling them to follow up if
needed and confirming that these conditions are stable, is not what you said we needed to do.  I was real
clear in asking and what all of my MDs heard is that all we were doing is confirming that these diagnoses
are on the problem list.  The work flow Jason is suggesting is drastically different.

Mike

24
25
26
27

165.    Guardino, pushed back with his own email, reproduced below, and the practices

have continued. Guardino's email glosses over the actual requirements by CMS, and instead

dissects the certification that Permanente pressures physicians into using.

28

FIRST AMENDED COMPLAINT
CASE NO. **2:20-cv-296**

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28



{In Archive}  Re: .refresh - clarification needed
Jason M Guardino   to: Michael J Bicocca, Steve Olson                    08/14/2015 08:01 AM
Cc:  Serene N Tran, Jeremy Lawrence, Keshia Y Redmond

History:              This message has been replied to and forwarded.

Jeremy/Keshia.... Can you both meet with Mike and his group.
It seems he does not understand the issue(s).

**Mike,**
I'm going to encourage you to read this email a few times to help clarify.  I think you don't understand the
issues.

Step 1.
Any doctor should always review the Active Problem List (APL), meds, allergies, just like vital signs.  I
think you agree.  I hope you agree.

Step 2.
MDP form is the gold standard.
If a patient has 20 problems on the APL.... while you should review them all because it is good medicine...
if the MDP form only has 3 of those 20... those are the three you code.  NOT ALL 20!

Step 3.
Lets say pt has DM and hx of Breast cancer (and these appear on the MDP form) and 5 other diagnosis
are NOT on the MDP form (while you should reviews these other 5 for the practice of good medicine, they
do not need to be coded).
So you move ONLY DM and Hx of Breast cancer (the ones on the MDP form) over from right to left and at
end of your note type .Refresh.

[Let me interject here that if you are completely uncomfortable coding a diagnosis because you are simply
in no way familiar with it (lets say it is 1 of the 5 dx on the MDP form).  Then you code the four you feel
comfortable and then route your note to the PCP and say, I coded 4 of the 5 diagnosis, but I don't feel
comfortable with XYZ dx - then PCP can do when they see patient - this would hopefully be rare instance].

Now.
Let's dissect the phrase knowing that it applies only to the ones you coded and moved over that
corresponded to the MDP form. In this case DM and Hx of Breast Cancer.

*I have confirmed the presence of the above clinical diagnoses, which were considered
in the current and ongoing care of the patient.*

So you are telling me that when a patient presents for pain block and has a history of breast cancer you
don't think for one second...... "hmmmm maybe this is metastatic breast cancer?  But not likely because
they are 5 years out and saw onc recently", for example.  You are not thinking... "maybe this is DM
radiculopathy?"  What if a patient has a history of BKA.... has nothing to do with RUE pain for example.
Weather you thought about these as pertinent positives or negatives, I hope you thought about them and
asked the patient about them.  And yes.. I do ask.  Before I do a colonoscopy you bet your colo I look at
the APL, allergies, meds, etc and think about what reactions they might have to conscious sedation or
polypectomy, etc.  In fact I ask almost every patient "do you take any medications called plavix or
coumadin"... even though it is not on their list at all!!

*At the time of this visit, the medical record indicates, and/or the patient states, that
there are no changes in these conditions unless otherwise noted.*

FIRST AMENDED COMPLAINT
CASE NO. **2:20-cv-296**

Again... I don't know what to tell you if you are not asking about DM or Hx of breast cancer if you are doing a block for pain.... I ask people about 'I know you had breast surgery... any surgery on your belly' before I do a cscope.

The medical record indicates... if you saw a note from onc during your chart review (hopefully you are doing some limited chart review) that says patient is five years out of breast cancer and clear.... the medical record indicates.  You don't need to ask it if you don't want to.

_As treatment warrants, the patient has been advised to follow up with her PCP or appropriate specialist._

As treatment warrants.... means if it is clinically indicated.  If DM is totally in control then treatment is not warranted.  If it is not in control..... you don't say 'DM radiculopathy may cause you more pain some day and you need to get your DM in control'.  Why not?
If that was your relative you wouldn't want a pain doc (or any other doc) telling them they should stop smoking for example?

I'm confused.  Your email sounds like some doctors are robots without thinking and then do their jobs in isolation... that is poor quality.
At the end of the day... coding ensures high quality of care - it ensures problems are being dealt with.... and that things don't fall through the cracks.  Yes, it takes a few extra minutes.  But I think most doctors need to start treating the whole patient... not only a nerve that causes some pain.  It's far from fraud Mike, if done right with thoughtful purpose.  As a chief I hope you are not poisoning the well of your docs with this and instead looking at this through a different lens of making sure the entire patient is being treated.

Thanks.
jason

Jason M. Guardino, DO, MS Ed., FACP
Asst. Physician In Chief (APIC) - Quality
Chief - Dept. of Gastroenterology
Kaiser - Permanente Medical Center, SSC.
6600 Bruceville Road
Sacramento, California  95823
Office: 916-688-6675 / Tie line: 8-527-6675
Mobile: 916-224-8448

NOTICE TO RECIPIENT:  If you are not the intended recipient of this e-mail, you are prohibited from sharing, copying, or otherwise using or disclosing its contents.  If you have received this e-mail in error, please notify the sender immediately by reply e-mail and permanently delete this e-mail and any attachments without reading, forwarding or saving them.  Thank you.

166.     The last set of emails from Bicocca include Regional Physician Director of Clinical Documentation and Coding Dr. Steve Olson, who these concerns were escalated up to afterwards.

167.     Dr. Olson oversaw training physicians on the chronic condition and .FOL language for Permanente.

168.     Olson responded by stating, again not engaging with the substance of Bicocca's worries: "if someone is on an anti depressant, and has a prior diagnosis of depression, it may not

- 42 -

be out of scope to ask if the patient is still taking the medication for depression that is listed on the medication list. If the patient says yes, and relates that s/he is being followed by PCP, etc, then would feel comfortable using the .FOL statement."

169.    Once again, Olson's response was markedly different and more stringent than what Bicocca was told during trainings, but still essentially recommended that physicians mark diagnoses and their management simply by asking patients about their conditions.

170.    Importantly, in explaining this, Olson did confirm that the point of these trainings was the capture of diagnoses for risk adjustment.

> Risk adjusted payment mechanisms require us to comprehensively and accurately code all the chronic conditions that exist in our patient population every calendar year.  To be able to submit a diagnosis for recognition and reimbursement, it must be compliantly coded in a qualifying encounter performed by a qualifying clinician.

171.    In one of the few instances in which Relator Bicocca was able to speak directly with Dr. Olson. Olson told Bicocca something to the effect of "of course Mike, if you don't know anything about hypoparathyroidism then don't code it." However, Olson then told Bicocca that he was expected to "know" about 90% of the listed conditions.

172.    Relator Bicocca again attempted to raise up the issue and clarify the legality of the certification he has been told to insert into his medical notes in September 2017.

173.    On September 18, 2017, Relator wrote to Jason Gritti, the doctor who was then responsible for trainings at South Sacramento, as well as Galina Flury and Keshia Redmond, to confirm what the coder who visited his office said was correct: "She said as long as we 'address' the problems and she was clear that all that needs is to confirm they were on a medication for that problem and tell them to follow up with the treating MD if needed. We could then include the visit diagnoses and a statement saying, 'these diagnoses were addressed today and the patient

- 43 -

was told to follow up with their treating provider if needed'." This was the same instruction Bicocca spent weeks clarifying with Dr. Olson in 2015.

174.    Gritti responded on the same day, stating "If you specifically address each item e.g. Migraine: continue topomax [sic] and follow up with the pcp as needed, then that is quite alright as well. You would just have to ensure you address each and every separate coded item."

175.    Gritti is essentially telling Relator Bicocca that, if he asks the patient about the condition, whether the patient is taking medication, and telling them to follow up with another physician on that condition, that he could diagnose or confirm the diagnosis of a condition and use the .FOL phrase to indicate that the condition was being managed.

## XI. Conclusion

176.    "Under Medicare Advantage's capitation system, private health insurance organizations provide Medicare benefits in exchange for a fixed monthly fee per person enrolled in the program—regardless of actual healthcare usage. These organizations pocket for themselves or pay out to their enrollees' providers the difference between their capitation revenue and their enrollees' medical expenses, creating an incentive for the organizations to rein in costs. Unfortunately, human nature being what it is, Medicare Advantage organizations also have some incentive to improperly inflate their enrollees' capitation rates, if these organizations fall prey to greed." *WellPoint, Inc.*, 904 F.3d at 667 (internal citations omitted).

177.    A common form of fraud, one that is occurring here, is falsely claiming to provide coverage and services to a beneficiary population that is not as sick as claimed.

178.    By explicit setting up separate requirements for physicians treating Medicare beneficiaries and patients with other public benefits plans differently than private pay or employer-based insurance, Defendants demonstrate knowledge that checking off additional

chronic conditions and using the .FOL language is material to the Government's decision to pay increased capitation for public benefits beneficiaries.

179.     Defendants are aware of the issues with this method of billing due to Bicocca raising the concerns of multiple physicians related to this issue.

180.     Defendants' misrepresentations are material to the government's decision to continue paying Defendants its capitation rate under the assumption patients are sicker than they really are.

181.     As a result, the government and the state have been damaged in a yet to be quantified amount.

### COUNT I
### Defendant Knowingly Presents, or Causes to be Presented
### False Claims
### 31 U.S.C. § 3729(a)(1)(A)

182.     Relator reasserts and incorporates by reference all paragraphs set forth above as if restated herein.

183.     31 U.S.C. § 3729(a)(1)(A) subjects to liability any person or entity that "knowingly presents, uses, or causes to be presented, a false or fraudulent claim for payment or approval."

184.     Defendants knowingly presented or caused to be presented to the United States, false or fraudulent claims, and knowingly failed to disclose material facts, in order to obtain payment or approval under the federally funded Medicare program in violation of 31 U.S.C. § 3729(a)(1)(A).

185.     Defendants knowingly submitted claims and received payment from the United States of America through CMS for inflated capitation rates that were based on false reporting of risk adjustment data by Defendants.

186.     The United States of America has been damaged by all the misrepresentations and failures to comply with requisite laws and regulations in an as of yet undetermined amount.

### COUNT II
**Defendant Knowingly Made, Used, or Caused to be Made or Used,**
**False Records or Statements Material to False Claims**
**31 U.S.C. § 3729(a)(1)(B)**

187.     Relator reasserts and incorporates by reference all paragraphs set forth above as if restated herein.

188.     The False Claims Act imposes liability on any person who knowingly makes, uses, or causes to be made or used a false record or statement material to a false or fraudulent claim. 31 U.S.C. § 3729(a)(1)(B).

189.     As a result of Defendants' actions, the Government paid funds from the Medicare Advantage program for capitation rates covering services not actually rendered.

190.     As a result of Defendants' actions, the Government paid funds from the Medicare programs for services that were not or could not be performed.

191.     Defendants knowingly made or used false records material to false claims when they, among other things, created records that indicated physicians rendered appropriate case management services, when in fact, appropriate case management services were not rendered to patients.

192.     The United States of America has been damaged by all the misrepresentations and failures to comply with requisite laws and regulations in an as of yet undetermined amount.

### COUNT III
**California False Claims Act Violations**
**Pursuant to Cal. Gov't Code § 12651(a)(1)**
**Knowingly Submitting False Claims for Payment**

193.     Relator reasserts and incorporates by reference all paragraphs set forth above as restated herein.

194. Defendants, individually and through the acts of their agents, servants, officers, and employees, knowingly presented, or caused to be presented, to an officer or employee of the California government, false or fraudulent claims for payment or approval under the CalPERS program in violation of Cal. Gov't. Code § 12651 (a)(1).

195. Defendants knowingly presented, or caused to be presented, to an officer or employee of the California government, false or fraudulent claims for payment or approval under the CalPERS program in violation of Cal. Gov't. Code § 12651 (a)(1).

196. Cal. Gov't. Code § 12651 (a)(1) imposes liability on a person or entity that knowingly presented, or caused to be presented, to an officer or employee of the California government, false or fraudulent claims for payment or approval.

197. The government of California, unaware of the falsity of the claims made by Defendants and in reliance on the accuracy thereof, paid Defendants for such false or fraudulent claims.

198. Defendants violate Cal. Gov't. Code § 12651 (a)(1) when they submit claims for inflated capitation rates that were based on false reporting of risk adjustment data by Defendants.

199. The claims submitted by Defendants are material to the state of California's decision on whether, and how much, to pay Defendants for services provided to CalPERS beneficiaries.

200. By reasons of the acts and conduct of Defendants in violation of Cal. Gov't. Code § 12651 (a)(1), the government of California has suffered actual damages, including the amounts paid in response to all such false or fraudulent claims for payment.

201. The state of California is entitled to recover civil money penalties, and other monetary relief as deemed appropriate.

## COUNT IV
**California False Claims Act Violations**
**Pursuant to Cal. Gov't Code § 12651 (a)(2)**
**Knowingly Making False Records Material to a False Claim**

202.    Relator reasserts and incorporates by reference all paragraphs set forth above as restated herein.

203.    Defendants, individually and by their own acts, or through the acts of their agents, servants, officers, and employees, knowingly made, used, or caused to be made or used, a false record or statement material to a false or fraudulent claim in violation of Cal. Gov't Code § 12651 (a)(2).

204.    Defendants knowingly made, used, or caused to be made or used, a false record or statement material to a false or fraudulent claim in violation of Cal. Gov't Code § 12651 (a)(2).

205.    Defendants violate Cal. Gov't Code § 12651 (a)(2) when they knowingly made or used false records material to false claims when they, among other things, created records that indicated physicians rendered appropriate case management services, when in fact, appropriate case management services were not rendered to patients.

206.    At all relevant times, Defendants were aware of, and displayed a conscience and reckless disregard for, the applicable CalPERS rules and regulations regarding the submission of claims for payment.

207.    The false statements created and submitted by Defendants is material to the state's decision on whether, and how much, to pay Defendants for services provided to CalPERS beneficiaries.

208.    By reasons of the acts and conduct of Defendants in violation of Cal. Gov't Code § 12651 (a)(2), the State of California has suffered actual damages, including the amounts paid in response to all such false or fraudulently supported claims for payment.

209.    The state of California is entitled to recover civil money penalties, and other monetary relief as deemed appropriate.

## PRAYER FOR RELIEF

WHEREFORE, Relator Michael Bicocca, acting on behalf of and in the name of the United States of America and the State of California, and on his own behalf, pray that judgment be entered against Defendants for violation of the False Claims Act as follows:

(a) In favor of the United States and State of California against the Defendants for treble damages to the federal and State government from the submission of false claims, and the maximum civil penalties for each violation of the False Claims Acts and California False Claims Act;

(b) In favor of the Relator for the maximum amount pursuant to 31 U.S.C. § 3730(d) to include reasonable expenses, attorney fees, and costs incurred by the Relator;

(c) For all costs of the False Claims Act and California False Claims Act civil action; and

(d) In favor of the Relator, the United States, and California for further relief as this court deems just and equitable.

## DEMAND FOR A JURY TRIAL

Pursuant to Rule 38 of the Federal Rules of Civil Procedure and pursuant to the local rules of this Court, Relator demands a jury trial as to all issues so triable.

- 49 -

1  October 2, 2020                              Respectfully submitted,

2

3                                              _____*s/ J. Bernard Alexander*_____
4                                              J. Bernard Alexander III (State Bar No. 128307)
                                               ALEXANDER MORRISON + FEHR LLP
5                                              1900 Avenue of the Stars, Suite 900
                                               Los Angeles, California 90067
6                                              (310) 394-0888
7                                              (310) 394-0811 (facsimile)
                                               balexander@amfllp.com
8                                              *Counsel for Plaintiff-Relator*

9                                              R. Scott Oswald (to be admitted *pro hac vice*)
                                               soswald@employmentlawgroup.com
10                                             Janel Quinn (admitted *pro hac vice*)
                                               jquinn@employmentlawgroup.com
11                                             The Employment Law Group, P.C.
12                                             888 17th Street, NW, Suite 900
                                               Washington, D.C. 20006
13                                             (202) 261-2806
                                               (202) 261-2835 (facsimile)
14                                             *Counsel for Plaintiff-Relator*

15

16

17

18

19

20

21

22

23

24

25

26

27

28

                                        - 50 -